29 A.3d 1129

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**George BANKS, Appellee.**

Supreme Court of Pennsylvania.

Argued Nov. 30, 2010.

Decided Sept. 28, 2011.

58

Jennifer Anne Peterson, William Ross Stoycos, PA Office of Attorney General, Amy Zapp, Harrisburg, for Commonwealth of Pennsylvania.

Albert Joseph Flora Jr., Wilkes–Barre, Matthew C. Lawry, Stuart Brian Lev, Helen A. Marino, Defender Association of Philadelphia, Billy Horatio Nolas, Philadelphia, William Ruzzo, Kingston, for George E. Banks.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Chief Justice CASTILLE.

The central issue in this case is whether George Banks is competent to be executed.[2] We hold that he currently is not.

Banks used a semi-automatic rifle to murder thirteen people, and seriously wound a fourteenth, in an early morning shooting spree on September 25, 1982 in and near Wilkes–Barre, Luzerne County, Pennsylvania. Five of the victims were children who shared the unlucky fate of having George Banks as their father: Montanzima Banks (age 6), Kissmayu Banks (age 5), Bowendy Banks (age 4), Mauritania Banks (age 1), and Foraroude Banks (age 1). Four additional victims were unfortunate to have been Banks' current or former

**2.** There is a secondary issue related to Banks' competency to pursue clemency proceedings, which is separately discussed in Section V of this opinion.

girlfriends: Susan Yuhas (age 23), who resided with him, Dorothy Lyons (age 29), who sometimes resided with him, Regina Clemens (age 29), who had resided with him until about two weeks before the murders, and Sharon Mazzillo (age 24), a former girlfriend. Three other victims were murdered because of their relationships to Banks' girlfriends or ex-girlfriends: Scott Mazzillo (age 7), the nephew of Sharon Mazzillo; Alice Mazzillo (age 47), the mother of Sharon Mazzillo; and Nancy Lyons (age 11), the daughter of Dorothy Lyons. The thirteenth and final murder victim was an unlucky passerby. Banks murdered teenaged Raymond Hall, who saw Banks as he was leaving his residence (presumably after killing eight people), and also shot and seriously wounded the teenaged James Olson, who was with Hall. All of the victims, save one, were under the age of thirty, and seven of the victims were under the age of twelve. The factual circumstances surrounding the murders are set forth in detail in this Court's opinion, denying Banks' direct appeal from the sentences of death and related crimes. *See Commonwealth v. Banks*, 513 Pa. 318, 521 A.2d 1 (1987).

A jury convicted Banks of twelve counts of first-degree murder, one count of third-degree murder, and various other offenses, and sentenced him to twelve separate sentences of death. Nearly thirty years later, Banks remains on death row, having exhausted all of-right avenues of state and federal review of his convictions and sentences. Federal *habeas corpus* review of his sentences ended in 2004, with the second of two decisions rendered by the U.S. Supreme Court in *Beard v. Banks*, 542 U.S. 406, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004). All that remained was execution of the death sentence, and on October 5, 2004, then-Governor Edward G. Rendell duly signed a warrant of execution, scheduling Banks' execution for December 2, 2004. Banks himself took no action in response to the execution warrant, but two weeks before the execution date, his mother Mary Yelland did, filing a "next friend" petition in the trial court, seeking a stay of execution on grounds that Banks was incompetent to be executed, and thus, his execution would violate the Eighth and Fourteenth

Amendments under *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). *See also Panetti v. Quarterman*, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007).

The judge, Michael T. Conahan, denied the petition for lack of jurisdiction, finding it was time-barred under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546. Assisted by Banks' long-time local counsel, as well as federal counsel from the Philadelphia Federal Defender, Yelland appealed to this Court in her son's name. On December 1, 2004, we issued a *per curiam* order assuming plenary jurisdiction under 42 Pa.C.S. § 726, stayed the imminent execution, and directed the trial court to "hold a competency hearing expeditiously in accordance with *Ford v. Wainwright.*" We retained jurisdiction, drafting the trial judge to act as master because competency can be contested factually and because there could be credibility questions to resolve. *See Commonwealth v. Banks*, 596 Pa. 297, 943 A.2d 230 (2007). On December 3, 2004, we further ordered the trial court to determine whether Banks had the capacity to initiate clemency proceedings or to designate someone to initiate them on his behalf.

To say that our direction for expedition went unheeded by former Judge Conahan, who has since been removed from the bench and has pleaded guilty to unrelated federal criminal charges, would be an understatement. Many of the delays involved maneuvers by federal counsel seeking to burden the Commonwealth's ability to have its mental health experts examine Banks in order to prepare a case in rebuttal against counsel's claim that Banks had become insane. These defense motions, which were not authorized by our order directing a competency hearing, caused delay in both proceedings before Conahan; and the motions and attendant delays continued following our most recent, third direction to hold an appropriate competency hearing. The competency question is important, but narrow, and it should have been resolved sooner. Following our review of the competency determination rendered by the Honorable Joseph M. Augello, this Court concludes that Banks presently is incompetent to be executed under the standards set forth in *Panetti* and *Ford.* As further

explained herein, we neither accept nor reject Judge Augello's additional determination related to Banks' competency to pursue clemency. The background and our reasoning follow.

—I—

After a series of delays detailed in the 2007 *Banks* opinion, the first competency hearing was held before then-Judge Conahan on January 30, 2006. Conahan found that Banks was incompetent to be executed and to decide whether to seek clemency. The Commonwealth sought review of that determination. One of the Commonwealth's primary complaints related to the trial court's refusal to permit the Commonwealth's expert to testify on the ground that defense counsel was not present during the expert's interaction with Banks. This Court concluded that there was no precedent from this Court or the U.S. Supreme Court requiring defense counsel's presence at a medical examination; we explained that the U.S. Supreme Court cases cited by counsel, *Ford* and *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), simply did not support the blackletter law propositions for which Banks' counsel cited them. We also emphasized that the counsel-presence requirement argued by counsel, and imposed by the trial court, was never authorized by this Court, which had retained jurisdiction. *See Banks*, 943 A.2d at 238. Accordingly, on December 28, 2007, we directed the trial court to hold a second competency hearing without the restrictions that had been placed on the Commonwealth and further directed that, "with the exception of scheduling and logistical matters, the trial court is not to be diverted by tangential motions and assertions by counsel: **this** Court retains jurisdiction over such matters." *Id.* at 239 (emphasis original).

Despite our direction for expedition, the second competency hearing was not held until nearly eight months later, on August 14, 15, and 18, 2008 ("2008 Hearing").[3] On September

3. On August 6, 2008, the Commonwealth filed two "emergency" applications, requesting this Court to address the issues raised therein prior to the scheduled second hearing: (1) an Emergency Application to

8, 2008, Judge Conahan issued an "order" again finding that Banks was incompetent under *Ford*, that he was incompetent to pursue clemency, and that his execution would violate the Pennsylvania and United States Constitutions. The Commonwealth appealed and the matter was briefed.

By order dated August 27, 2009, this Court: (1) rejected Judge Conahan's wholesale adoption of defense counsel's proposed findings of fact and conclusions of law as to Banks' competency to be executed and to pursue clemency; and (2) referred the matter, while retaining plenary jurisdiction, to then-President Judge Chester B. Muroski of the Luzerne County Court of Common Pleas to assign the case to another judge to hold a *de novo* competency hearing as expeditiously as possible.[4] *See Commonwealth v. Banks*, 605 Pa. 259, 989 A.2d 1 (2009). In doing so, we noted that Conahan "simply adopted appellee George Banks' counsel's proposed findings of fact and conclusions of law wholesale as his purported 'Determination of Competency Issues' " in violation of this Court's requirement of an "autonomous judicial expression of the reasons for granting or denying post-conviction relief." We also concluded that the proposed findings Conahan adopted were inappropriate for the decisional task because they includ-

Correct Caption of Appeal and to Clarify Context for Litigation; and (2) an Emergency Application to Compel Appearance of George Banks at Competency Hearing. Because the first application raised obvious issues that were available to the Commonwealth all along—*e.g.*, whether this Court had authority to order the original competency hearing, whether Mary Yelland was an appropriate next friend, and whether a conflict of interest existed in light of the fact that the same counsel were representing both Yelland and Banks—we dismissed that application without prejudice to the Commonwealth's ability to raise such issues after the second hearing. We denied the Commonwealth's application to compel Banks' appearance as stated, but directed the trial judge to ensure his appearance while recognizing the judge's discretion to order Banks removed, if necessary. We further reminded the judge to "render a determination on competency as soon as possible following the hearing."

4. Subsequent to our August 27, 2009 order, Banks filed an application for reargument, which we denied by *per curiam* order dated October 23, 2009. Notably, our order again directed the trial court to proceed in accordance with our prior orders as expeditiously as possible, and that it was not to delay the proceedings without prior authorization of this Court.

ed findings beyond the scope of the limited hearing. Finally, we noted that we could not simply return the matter to Conahan for resolution because of his subsequent removal from the bench in disgrace.

The duty to hold a third competency hearing was initially assigned to the Honorable Charles C. Brown, Jr., Senior Judge of Centre County. Banks' counsel then filed two additional motions with this Court—a Motion for Notice of Evaluations by Commonwealth Experts and a Motion for Videotaping of Evaluations by Commonwealth Experts— which caused even more delay, and which were summarily denied. This Court issued an extraordinary *per curiam* order on February 16, 2010 denying the motion related to videotaping, and noting that, "[t]his Court having now twice ruled upon the serial objections petitioner has forwarded concerning the manner in which the Commonwealth's competency examinations should be conducted, any further challenge to the evaluations is deemed defaulted." Our order also noted that, in the time since we had directed a new hearing, the severe shortage of commissioned judges in Luzerne County had been partially remediated, and so we directed the President Judge of Luzerne County "to reassign this matter to a sitting commissioned judge of the Court of Common Pleas of Luzerne County, who is to conduct any further proceedings, including the competency hearing this Court directed on August 27, 2009." *Commonwealth v. Banks,* 605 Pa. 322, 989 A.2d 881, 883 (2010).

Thereafter, Judge Augello was assigned to preside over the third competency hearing. He promptly held the hearing on April 27–30, 2010, and filed proposed findings of fact and conclusions of law with this Court on May 17, 2010. Judge Augello concluded that Banks did not comprehend the reasons for the death penalty, and accordingly, found him incompetent under *Ford.* Judge Augello also found that Banks did not possess the mental capacity to initiate clemency proceedings or to designate someone to pursue clemency proceedings on his behalf. The Commonwealth filed exceptions to the pro-

posed findings, Banks responded and this Court heard oral argument.

Judge Augello's proposed findings and the Commonwealth's exceptions are now before this Court for final disposition. Before turning to Judge Augello's findings and the parties' arguments, a brief explication of this Court's jurisdiction is in order.

## —II—

This Court's December 1, 2004 order, invoking extraordinary jurisdiction to resolve the competency-to-be-executed question, implicitly recognized that there was no existing vehicle for Banks to present his execution-related claim. As the PCRA court initially determined, the competency-to-be-executed question did not squarely fall within any of the exceptions to the one-year time bar to the jurisdictional time requirements of the PCRA. *See* 42 Pa.C.S. § 9545(b)(1)(i)-(iii). Additionally, *Ford* itself provided no guidance on the subject, leaving it to the States to formulate their own procedures to review competency-to-be-executed questions as well as the substantive standards governing such review. Since that time, the High Court has at least clarified some of the outer parameters governing the process that is due when a colorable competency challenge is raised. *See, e.g., Panetti,* discussed *infra.* However, *Panetti* does not direct the specific vehicle for pursuing such relief and the question remains unanswered in Pennsylvania. For these reasons, this Court invoked its extraordinary jurisdiction under 42 Pa.C.S. § 726 to review the instant competency-to-be-executed challenge.

Subsequently, this Court referred the matter to the Criminal Procedural and Appellate Court Procedural Rules Committees to formulate rules governing the presentation and review of competency-to-be-executed claims. *See Banks,* 943 A.2d at 234 n. 7. The rules have yet to be finalized as of this writing and this Court is awaiting the recommendation. *See* 40 Pa. Bull. 2397 (May 8, 2010) (proposed criminal procedural rules published for public comment) and 40 Pa. Bull. 2393

(May 8, 2010) (proposed appellate procedural rules published for public comment).

At the time Banks' counsel originally filed the competency-to-be-executed challenge there was no reason to foresee the intolerable delay that has occurred. Some of the reasons for delay can be addressed when the procedural rules are finalized; others require a firm hand by the judge making the competency determination. A *Ford* claim presumably ripens only after a death warrant has issued; those warrants establish a date certain for execution and expire in sixty days, *see* 61 Pa.C.S. § 4302(a) (expiration of warrant sixty days after it is signed), and expedited treatment of the claims is required so that, where possible, the claim is finally determined within the time-frame of the warrant.

Initially, in this case, there was a delay in filing the competency challenge, which occurred only two weeks before the scheduled execution—an unrealistic time-frame to permit the trial court to hold a competency hearing and for this Court's review under the best of circumstances, and even if an established procedure had been in place. This initial delay was then compounded by the circumstances we have already summarized above concerning Judge Conahan and the piecemeal procedural motions and arguments forwarded by Banks' counsel. This case demonstrates the need for rules that provide a workable framework for the presentation of *Ford* claims after a warrant for execution has been signed. Any such rules must account for expedited filings by the parties, a mechanism to screen for colorable claims, an accelerated hearing if a hearing is deemed necessary, procedures to account for the minimum due process requirements as most recently set forth in *Panetti,* and other adjustments that may emerge in future decisional law.

—III—

This Court's task is narrow here. The case is proceeding in our plenary jurisdiction, in the absence of another mode of review, and all that remains is disposition of the substantive

competency question which is now, finally, properly before us. In other matters where we have invoked plenary jurisdiction, and appointed a trial judge to essentially act as master while retaining jurisdiction, we have concluded that our review is *de novo*. *See Annenberg v. Commonwealth et al.*, 562 Pa. 581, 757 A.2d 338, 342–43 (2000).[5] This case is different, however, since in the normal course going forward, we anticipate that the initial competency review will be conducted by the trial court in which the petition challenging competency is filed, with direct appellate review following in this Court in a standard, but accelerated, fashion. Indeed, until formal Rules are adopted, this case is to be construed as repositing authority in the appropriate trial court to entertain colorable *Ford* challenges.

■ Normally, a convicted capital defendant is presumed competent and must establish his incompetency by a preponderance of the evidence. *Commonwealth v. Zook*, 585 Pa. 11, 887 A.2d 1218, 1226–27 (2005) (competency to proceed with post-conviction relief); *Commonwealth v. Jermyn*, 551 Pa. 96, 709 A.2d 849, 855 and n. 15 (1998) (competency to be executed). When competency determinations are made by the trial court in similar circumstances, we have been clear that this Court's review is limited to determining whether the trial court abused its discretion since the trial court had the opportunity to hear the necessary expert testimony and observe the condemned firsthand. "An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. A finding by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion." *Commonwealth v. Frey*, 588 Pa. 326, 904 A.2d 866, 872 n. 9 (2006). Furthermore, a trial judge passing upon competency is free to accept

5. In *Annenberg*, although we suggested our review was *de novo*, we clarified that while the lower court's fact findings are not binding upon this Court, "we will afford them due consideration, as the jurist who presided over the hearings was in the best position to determine the facts." *Id.*

one expert witness's opinion over that of a conflicting opinion so long as there is adequate record support. *See Commonwealth v. Pruitt*, 597 Pa. 307, 951 A.2d 307, 316 (2008) (competency to stand trial); *Commonwealth v. Sanchez*, 589 Pa. 43, 907 A.2d 477, 490 (2006) (same); *Commonwealth v. Frey*, 588 Pa. 326, 904 A.2d 866, 872 (2006) (competency to plead guilty); *Zook, supra; Commonwealth v. Appel*, 547 Pa. 171, 689 A.2d 891, 899 (1997) (competency to stand trial).

█ The Commonwealth has advocated for a *de novo* standard of review consistent with *Annenberg*, which would be less deferential to the hearing judge, tying its argument to the fact that we exercised extraordinary jurisdiction and appointed a trial judge to act as master. But, our exercise of extraordinary jurisdiction was occasioned by the importance of the constitutional question, and the fact that there was no existing, procedural mechanism by which this important and cognizable federal claim, a claim unique in that it ripens in the face of an execution warrant, could be litigated. That circumstantial anomaly does not operate to alter the nature of a competency determination, or the respective roles of trial judges and appellate courts. There is no need to depart from the settled abuse of discretion standard in reviewing Judge Augello's findings of fact and conclusions of law simply because there was no existing vehicle for entertaining a competency-to-be-executed challenge. Accordingly, we will consider whether Judge Augello abused his discretion in finding Banks currently incompetent to be executed.

—IV—

Before turning to those findings, a brief outline of the competency proceedings is warranted. Banks presented four experts in support of his assertion that he was incompetent to be executed—Dr. John S. O'Brien, M.D., Dr. Jethro Toomer, Ph.D., Dr. Richard Dudley, M.D., and Dr. Robert Sadoff, M.D. In response the Commonwealth presented two experts—Dr. Stephan Mechanick, M.D., and Dr. Timothy Michals, M.D. Banks then presented rebuttal testimony from Dr. O'Brien.

There were many similarities among the experts' testimony. All of the experts agreed that Banks suffered from a psychotic disorder, not otherwise specified ("NOS"). Furthermore, the experts generally agreed that Banks suffers from psychotic symptoms that have persisted for many years despite treatment with antipsychotic medication. The symptoms include auditory hallucinations, delusions, and prominent thought disorder.[6] The experts also generally agreed that Banks was not malingering and had many fixed delusions, including his belief that a police conspiracy resulted in at least two of the victims' deaths,[7] that he was being poisoned in prison as part of a Department of Corrections conspiracy, that he was currently incarcerated as part of a government conspiracy, and that he was "supposed to be exempt" from the sentence of death or that his sentences of death had been vacated by God, Jesus, the Governor, George Bush, or some combination of the same.[8, 9, 10] N.T., 12, 13, 21, 29–30, 69 (Dr. O'Brien); *id.* at 149,

6. The hallucinations are of two types: a "digital woman" who tells him about things, and a gurgling noise, the primary purpose of which is to keep him from concentrating.

7. Dr. O'Brien explained that Banks believes that "some of the victims of his crime were actually killed by the police, and that other victims were re-shot by the police or reinjured by the police." N.T., 25; *see also id.* at 394 (testimony of Dr. Sadoff). Furthermore, Dr. Mechanick acknowledged that Banks attributed two of the deaths to the police as part of a conspiracy, involving re-shooting "most" of the victims, slitting one of the victim's throats, and killing two of the victims. N.T., 458.

8. Banks' belief that his sentences were vacated had some tangential factual foundation, since Banks' sentences effectively were briefly vacated in 2001 when the Third Circuit Court of Appeals entered an order granting *habeas corpus* relief conditioned upon a new penalty phase. *Banks v. Horn,* 271 F.3d 527 (3d Cir.2001). This order was subsequently reversed by the U.S. Supreme Court by *per curiam* order and the matter was remanded for further proceedings. *Banks v. Horn, supra.* Ultimately, as stated previously, federal *habeas* relief was denied.

9. Dr. Mechanick acknowledged the testimony of the defense experts related to Banks' belief that his sentences were vacated. He also testified that Banks expressed a similar belief to him when Banks stated that he was "supposed to be exempt" from the death penalty. Dr. Mechanick explained that Banks' belief was a "rational belief based on a factual piece of paper that appeared to be truly a court ruling [presumably the 2001 Third Circuit order]." *See* N.T., 493–94.

10. Banks never expressed the idea that he was "supposed to be exempt" from the death penalty or that his sentences were vacated to Dr.

153–55 (Dr. Toomer); *id.* at 244, 253–54, 263, 280 (Dr. Dudley); *id.* at 380–81, 389–90, 394 (Dr. Sadoff); *id.* at 449–51, 457–58, 477–78 (Dr. Mechanick); *id.* at 674, 688–89, 706–708, 714 (Dr. Michals).

The experts also generally agreed that Banks was capable of some "rational" thought. As explained by Dr. O'Brien, "he is capable of a factual recitation of his circumstances. And to the extent that, that's rational, yes, he is capable of that ... you wouldn't expect his psychotic condition to interrupt or interfere with his ability to present to you information factually and reasonably about his circumstances because that's part of being cognitively intact, and that's a feature of psychotic illness.... He is able to give you rational, factual information about his circumstances consistent with the cognitive intactness that you would expect to see in an individual with a psychotic disorder like Mr. Banks." N.T., 773–74. Thus, there were areas of agreement among the experts on both sides.

The primary distinction between the two sides was how Banks' delusional belief system affected his rational awareness of the death penalty and its implications. The defense experts agreed that Banks could make a factual link between the death penalty and his conviction, but opined that the link was irrational and illogical because the delusions had become so interwoven with the factual understanding of his circumstances. Dr. O'Brien testified that Banks understands he is in prison, and that he is in prison for the multiple murders. Furthermore, Dr. O'Brien admitted that there were times that Banks would say that he was facing the death penalty for the convictions, but then state that the sentences were vacated. Banks did not understand that the two statements were inconsistent. N.T., 35–36, 137; *see also id.* at 218 (Dr. Toomer admitting that Banks is competent to perform activities of

Michals. Dr. Michals, however, accepted that Banks possessed this delusional belief based on the other experts' testimony, and his prior examinations of Banks. Dr. Michals then explained that he concluded that the delusion was less prominent than it had been in the past, based, in part, on the fact that it was not discussed during his interview with Banks.

daily living, but reiterating that he lacks the capacity to engage in "coherent, logical, organized thought processes"); *id.* at 336 (Dr. Dudley also testifying to Banks' understanding both that he is subject to the death penalty and that his sentences have been vacated and explaining "both things are just as real to him, and they're not—they're not in conflict with each other; and, I believe that both are persistent pieces of information that are in his head and form his life."); *id.* at 390 (Dr. Sadoff testifying that Banks "has an intellectual awareness that he had been convicted of 13 homicides, and that he was given the death penalty back in 1983.").

The defense also offered testimony that Banks did not believe his incarceration or death sentence was related to the murders, but instead, was a result of a government conspiracy. Dr. Toomer testified that Banks is aware of the death penalty, but identifies a number of differing reasons as to why he is subject to the punishment, including "racism, his understanding of the Bible, his special relationship with God, and the goal being to in some way circumvent or in some way sabotage his religious beliefs and insight." N.T., 155; *see also id.* at 252–53, 282–84 (Dr. Dudley testifying that Banks believed his religious enlightenment made him a target and "there has been an increasing effort to stop him from doing the work that he is doing that's been directed to [sic] by God."); *id.* at 381, 385 (Dr. Sadoff testifying that Banks believes he is being held illegally and he should be out ministering to the people; and that it is the "Muslim government that is against me").

Thus, the defense experts generally shared an opinion that any link Banks made between his convictions and the death penalty was not rational, *i.e.*, his hallucinations and delusional thought process (of his exoneration and sentences being vacated) were so intertwined with his rational thought process that he was unaware of the reasons for the penalty. For example, Dr. O'Brien testified that while Banks understands certain aspects of his circumstances, "because of the—of his symptoms, his delusional beliefs and his thought disorganization becomes so interwoven in all of that—for example, he's not able to consistently identify his situation or the—the penalty

for his convictions." N.T., at 35; *see also* N.T., at 164–65 (Dr. Toomer testifying that "[religion] is intertwined with and it colors every aspect of his functioning and when you communicate with him, that intertwining of all aspects becomes very apparent. . . .").

On the other hand, the two Commonwealth experts testified to an opinion that Banks was competent to be executed. Both experts agreed that Banks was more communicative and his delusions seemed to be less prominent than in past examinations, indicating that his latest course of medication was effective. Turning to their specific testimony, Dr. Mechanick explained that Banks' "racist" theory was a way of "providing a rational excuse or explanation for why he committed the crimes. He's not—he's not providing a response that is a delusional explanation . . . his response indicates that he does have a sense of wrongfulness and is excusing it or explaining it for a rational reason. . . ." Dr. Mechanick also explained that although there were two competing thoughts in Banks' mind— the rational thought that he was going to be put to death and the delusional thought that the sentences were vacated— Banks showed an understanding that "he is involved in a process involving the death penalty; that it's still ongoing. That it hasn't simply, as we've heard from other testimony, been vacated." Dr. Mechanick further testified that Banks' belief that his sentences were vacated was an "unrealistic belief. It didn't seem reasonable for him to believe in 2010, given what's transpired since 2001, that his death sentence was currently vacated. And I do think there is a portion of him that has that unrealistic belief. . . . But . . . he didn't add anything of a delusional nature to explain why he would have been excused from the death penalty or why it would have been vacated." Dr. Mechanick admitted that Banks was not delusion free, but explained that there is a "range of delusional—intensity of delusional belief and prevalence of delusional belief. . . . In Mr. Banks' case, there's been some improvement. He is not free of delusions. He still has them. And at times they're more prominent and more intense than at other times, but they're not there of equal intensity all the time."

Thus, in Dr. Mechanick's opinion, the delusions did not occupy "so much of the stage" as to prevent Banks from a rational understanding of the death sentence and the reasons for it. N.T., 463, 474, 481, 492, 493–94, 500–03, 517.

Dr. Michals offered similar testimony, testifying that Banks told him that he was sentenced to death for the crimes of which he was convicted. Dr. Michals also testified that he had considered the testimony of the defense experts regarding Banks' delusional belief that his sentences were vacated and believed that Banks was "basically, what he's saying, he's been forgiven.... He also had religious expressions that he's been forgiven by God." Like Dr. Mechanick, he acknowledged that Banks had "conflicting" thoughts, and explained that the delusions were the way in which Banks dealt with his situation, but further opined that he had rational thoughts and understood that the State had the right to execute him as a result of his crimes. N.T., 684, 689–90, 697, 700.

Finally, the defense presented rebuttal testimony from Dr. O'Brien, who testified that the Commonwealth's experts' testimony had not changed his opinion. Dr. O'Brien testified to the interplay between the psychosis and cognitive awareness, explaining first that psychotic disorders do not impair cognitive function. In other words, people can simultaneously have both an active psychosis and an intact factual awareness of their circumstances and normally the psychosis and the factual appreciation are parallel. However, in this case, Banks' "psychosis is intertwined with his appreciation of his factual circumstances, and it deprives him of having a rational understanding of his circumstances." Dr. O'Brien reiterated that Banks had "an intact factual appreciation" of his conviction and that he is on death row, but then explained that, although "unusual," Banks' psychosis had become intertwined with the factual appreciation of his circumstances, rendering his understanding of the penalty and the reasons for it to be irrational. Dr. O'Brien also specifically addressed the Commonwealth's experts' testimony, opining that Dr. Mechanick's analysis was "inadequate" and that Dr. Michals' testimony was largely fact-focused and did not take into account whether Banks' psycho-

sis interferes with his rational understanding of the penalty. N.T., 757–60, 761–63, 768; *see also id.* at 392 (reflecting Dr. Sadoff's opinion of the Commonwealth's experts' testimony: "They agreed that he had a delusional [belief] system about his sentence being vacated. And I was at a loss to find the logical link between their agreeing with the psychosis and the delusion, and they're [sic] finding him competent. I just didn't understand that.").[11]

Following the hearing, Judge Augello submitted his opinion, articulating his understanding of the competency standard as that set forth in *In re Heidnik,* 554 Pa. 177, 720 A.2d 1016 (1998), stressing that Banks is presumed to be competent to be executed, and he must overcome that presumption by a preponderance of the evidence. Judge Augello credited the defense experts' testimony and rejected the Commonwealth's experts' testimony to the extent their testimony was inconsistent with that of the defense. Judge Augello found that: Banks is "incapable of rational thought"; "it's impossible to carry on a logical and coherent conversation with Banks"; Banks believes there is a conspiracy against him "and that the reasons he might be executed are because of the conspiracy due to his campaign against racism, his understanding of the Bible, his special relationship with God, and the goal being to in some way circumvent or in some way sabotage his religious beliefs and insight"; Banks "has an intellectual awareness that he had been convicted of 13 homicides, and that he was given the death penalty back in 1983. He doesn't have a clear awareness now, because now he believes, unshakably, that his sentence has been vacated and he is free to leave as soon as the conspiracy ends"; and "there is no logical link between the Commonwealth's experts agreeing with the psychotic diagno-

11. Banks did not take the stand and testify on his own behalf. He was in the courtroom throughout the competency hearing and was not disruptive in any fashion, although there was some indication that his conversations with counsel were disorganized. *See,* N.T., 20 (Dr. O'Brien's testimony on direct examination: "And even up until today, when I was overhearing his conversations here in the courtroom, he remains psychotically preoccupied with the stained glass window, talking about the voices he's hearing. So his symptoms are persisting up until this very moment.").

sis and Banks' delusional [belief] system about his sentence being vacated and their opinion[s] finding him competent." Opinion at p. 4, ¶¶ 3 and 4, p. 6, ¶ 14, p. 13, ¶ 37, p. 14, ¶ 41.

Judge Augello concluded that the sum of the evidence suggested that Banks suffers and continues to suffer from gross delusions which put any awareness of the link between his crimes and his punishment "in a context so far removed from reality that the punishment can serve no proper purpose." Opinion at 17. For this reason, he found that Banks satisfied his burden to prove that he is incompetent to be executed under *Ford.* Finally, Judge Augello indicated that Banks' mental state should be monitored and the Commonwealth should be permitted to attempt to establish his competency if there is a material change in his condition.[12]

The Commonwealth filed the instant exceptions to Judge Augello's findings in this Court. According to the Commonwealth, five of the six experts agreed that Banks has some degree of comprehension of the existence, meaning, and/or purpose of his death sentence. Thus, he cannot establish that he is incapable of rationally comprehending the meaning and purpose of the sentence. The Commonwealth urges us to adopt Dr. Mechanick's testimony as it was "highly credible": his analysis was extremely thorough, offered a complex, multidimensional analysis of Banks, and reflected professional objectivity and evenhandedness.[13] The Commonwealth reiterates that the defense experts agreed that Banks had some degree of rational understanding of his impending execution and the reasons for it.

12. Judge Augello's suggestion that Banks' mental state should be monitored and the Commonwealth should be permitted to demonstrate Banks' competency upon a showing of a material change in his mental state is consistent with amendments to the criminal procedural and appellate procedural rules which have been proposed for public comment, but which have not yet been recommended to, nor adopted by, this Court.

13. The Commonwealth's position assumes that this Court's review is *de novo,* a position that we have considered and rejected as discussed *supra.*

The Commonwealth next turns to Judge Augello's findings of fact, arguing that the evidence did not support that Banks was **incapable** of rational thought; indeed, all of the experts agreed that he was capable of rational thought. Similarly, the conclusion that it was **impossible** to carry on a logical and coherent conversation with Banks was unsupported by the evidence, since the experts also generally agreed that he could communicate logically. *See supra* quoting Judge Augello's Opinion at p. 4, ¶¶ 3 and 4. The Commonwealth asks this Court to reject the testimony of Dr. O'Brien, since it was contradictory and inconsistent. The Commonwealth argues that the evidence showed that Banks understands, at times, that he is subject to the death penalty and the reasons for such punishment. Thus, the Commonwealth urges this Court to reject what it terms the "lopsided and one-dimensional" findings of Judge Augello, and find that Banks is competent to be executed.[14]

**14.** The Commonwealth also takes exception to Judge Augello's May 12, 2010 order denying the Commonwealth's motion to strike the defense experts' reports that were filed prior to the competency hearing. The heart of this dispute centers on two of the defense experts' reports (those of Drs. Toomer and Dudley) that were submitted prior to the competency hearing, which contained opinions that were redacted during the competency hearing. *See* N.T., 418–29 and 797–810. Indeed, the redaction was hotly contested during the competency hearing and related to those portions of the experts' reports that referenced their conclusions regarding Banks' competency (from the 2006 and 2008 competency hearings). During the competency hearing before Judge Augello, the judge agreed to redact portions of the experts' reports; however, the reports that were submitted prior to the hearing were unredacted and are part of this Court's record given Judge Augello's May 12th ruling. Thus, the Commonwealth argues that Judge Augello's ruling was in error as a reviewing court may not consider evidence that was not introduced into evidence at the competency hearing.

This Court agrees with the Commonwealth that the prior submitted reports should be stricken from the record. Judge Augello was understandably reluctant to do so given this Court's many directives explaining the limited parameters of his authority. Nevertheless, at this juncture it is proper for this Court to strike the unredacted reports. Furthermore, Judge Augello's decision to redact those portions of the experts' reports expressing their conclusions from the 2006 and 2008 competency hearing was proper, as such conclusions were not relevant to the question of Banks' current competency to be executed.

Banks has filed a responsive brief arguing that Judge Augello's findings are supported by the record and free of legal error. Turning first to the law, Banks avers that the Commonwealth's position mirrors that of the Fifth Circuit Court of Appeals in *Panetti v. Quarterman.* Banks then argues that the High Court "condemned the Fifth Circuit's approach" because it erroneously deemed Panetti's delusional belief system irrelevant to the question of whether he had a rational understanding of his execution. *See* Banks' Response to Commonwealth's Exceptions, at 45–46 (discussing *Panetti,* 551 U.S. at 949, 127 S.Ct. 2842 (2007)). According to Banks, the Commonwealth commits the same error as the Fifth Circuit by asking this Court to interpret *Ford* to require a finding that Banks is competent as long as he has "any comprehension" of his impending execution regardless of whether that comprehension is rational.

Banks next argues that Judge Augello's findings were supported by the record. Banks contests the Commonwealth's request to adopt Dr. Mechanick's direct testimony, by pointing out that much of it was undermined by his testimony on cross-examination. Furthermore, according to Banks, some of Dr. Mechanick's testimony was contradicted by Dr. Michals, the Commonwealth's own expert. Banks argues that Dr. Mechanick's testimony erroneously adopts an absolutist view of competency and fails to consider how Banks' delusional beliefs affect his rational understanding of the death penalty. As an example, Banks cites to Dr. Mechanick's testimony that Banks' belief that his sentences were vacated as "unreasonable" instead of "delusional." *See* N.T., 493–94, quoted *supra.* In any event, according to Banks, Judge Augello's findings were clearly supported by the defense experts, who consistently testified that Banks believes that his sentences have been vacated by God, Jesus, George Bush, or the Governor, and that any sentence of death currently imposed would be for reasons other than his murder convictions, *i.e.,* a conspiracy based on racism or religious belief.

Having recounted the experts' testimony, Judge Augello's findings of fact and conclusions of law, and the parties' argu-

ments in support of their respective positions, we now turn to the substantive law governing competency-to-be-executed determinations.

In the seminal case of *Ford v. Wainwright*, the U.S. Supreme Court established that the Eighth Amendment prohibits the execution of one who is insane.[15] In reaching this conclusion, a four-Justice plurality of the High Court considered the common law bar of execution of a prisoner who has lost his sanity. The plurality acknowledged that the reasons for the prohibition were "less sure and less uniform than the rule itself." 477 U.S. at 407, 106 S.Ct. 2595. Nevertheless, it determined that the common law prohibited such a sentence from being carried out and the practice was "carried to America, where it was early observed that 'the judge is bound to stay the execution upon insanity of the prisoner.' " *Id.* at 408, 106 S.Ct. 2595. The plurality then turned to the practice in the United States, finding that no State in the Union permits the execution of one who is insane. Thus, the plurality had little difficulty reaching the broad conclusion that a sentence of death could not be carried out on one who is insane.

The plurality then indicated that the manner in which the judicial system protects the Eighth Amendment value, *i.e.*, the procedures that must be followed when a death-sentenced prisoner alleged insanity, were a matter of contemporary law. The plurality held that the procedures used in Florida, which were conducted wholly within the executive branch, were inadequate. However, the plurality did not conclude that a full trial was necessary to protect the Eighth Amendment interest and left to the individual States the task of developing appropriate procedures to enforce the prohibition. The plurality also indicated that the competency-to-be-executed inquiry was guided by whether the alleged mental illness "prevents [the petitioner] from comprehending the reasons for the penalty or its implications." *Id.* at 417, 106 S.Ct. 2595. Or, as

15. Although a plurality opinion, the lead holding garnered a majority as Justice Powell wrote a separate concurring opinion agreeing that the Eighth Amendment prohibited the execution of an insane individual.

stated by Justice Powell in concurrence, the appropriate inquiry asks whether petitioners are "unaware of the punishment they are about to suffer and why they are to suffer it." *Id.* at 422, 106 S.Ct. 2595 (Powell, J., concurring). Thus, while *Ford* held that the Eighth Amendment prohibited execution of the insane, it gave only limited guidance to the States respecting implementation of the restriction; *Ford* did not prescribe the specific process due in such circumstances and gave only a broad definition of "insanity" for purposes of execution.[16]

Over twenty years later, the High Court revisited the competency-to-be-executed question in *Panetti v. Quarterman*, shedding more light on how competency should be evaluated under the Eighth Amendment. Relevant to the instant proceedings was the question of how the petitioner's delusions should be treated in determining competency.[17]

**16.** It appears that the procedure that is due once a prisoner has made a "substantial showing" of incompetency must meet the minimum standards set forth in Justice Powell's concurrence in *Ford*, as Justice Powell's opinion provided the narrower holding on the question presented. *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977); *see also Panetti v. Quarterman*, 551 U.S. at 949, 127 S.Ct. 2842 (following Justice Powell's concurrence as the "clearly established law" in assessing whether the Texas procedure was adequate). Justice Powell observed that the protections included a "fair hearing" at which the prisoner must be given the opportunity to be heard. *See Ford*, 477 U.S. at 424, 106 S.Ct. 2595. Justice Powell further noted that a trial was unwarranted as due process requires only "such procedural protections as the particular situation demands." Where the challenge is competency to be executed, the conviction remains valid and the only remaining question is "not *whether*, but *when* his execution is to take place." *Id.* at 425, 106 S.Ct. 2595 (emphasis in original). Therefore, a State may require the petitioner to make a "substantial showing of insanity merely to trigger the hearing process" and the hearing process itself may be less formal so long as the State provides "an impartial officer or board that can receive evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination." *Id.* at 426, 427, 106 S.Ct. 2595. We have already rejected Banks' various prior challenges to the process this Court has directed in this matter, noting that the restrictions counsel sought were unsupported by the governing case from the High Court which counsel cited. There has been no further challenge to the adequacy of the process provided in this case.

**17.** The *Panetti* Court found that the competency proceedings Texas had employed, like the competency proceedings employed in *Ford*, were

In *Panetti*, a defense expert testified that Panetti suffered from " 'schizo-affective disorder,' resulting in a 'genuine delusion' involving his understanding of the reason for his execution." *Id.* at 954, 127 S.Ct. 2842. According to the expert, Panetti understood the stated reasons for the execution to be a "sham," and instead believed that the state wanted to execute him to stop him from preaching. The High Court further noted that Panetti's other experts reached similar conclusions. In response, the State's experts did not discount the delusion, but resisted the idea that the belief was indicative of incompetency, "particularly in light of his perceived ability to understand certain concepts and, at times, to be 'clear and lucid.' " *Id.* at 955, 127 S.Ct. 2842. As noted previously, the Fifth Circuit Court of Appeals determined that Panetti was aware that he committed the murders, was aware that he would be executed, and was aware of the reason the State had given for the execution. For these reasons, the Fifth Circuit determined the petitioner was competent to be executed.

The High Court disagreed, finding that the Fifth Circuit failed to consider whether Panetti's mental illness prevented him from reaching a "rational" understanding of the State's reasons for the execution. "A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it." *Id.* at 959, 127 S.Ct. 2842. In reaching this conclusion, the High Court found that Panetti's delusional belief system was relevant to his rational understanding of his

inadequate. The Court indicated that the prisoner made a "substantial showing" of incompetency and was thus entitled to an adequate means to prove his incompetency. In the *Panetti* Court's view, the Texas court failed to afford the prisoner adequate process when it did not allow him to present his own expert, refused to transcribe the competency proceedings, conveyed false information to the prisoner, and provided at least one significant update to the State that it did not provide to the prisoner. *Panetti*, 551 U.S. at 950–52, 127 S.Ct. 2842.

None of the deficiencies mentioned in *Panetti* are present here. Furthermore, we need not explore the specific contours of the process to be provided for future *Ford* challenges in Pennsylvania, but will leave it to our Rules Committees to devise procedures in the first instance, which, as a constitutional matter, are constrained only by the expressions of Justice Powell in *Ford* and the majority in *Panetti*.

punishment, noting that the "*Ford* opinions nowhere indicate that delusions are irrelevant to 'comprehension' or 'awareness' if they so impair the prisoner's concept of reality that he cannot reach a rational understanding of the reason for the execution. If anything, the *Ford* majority suggests the opposite." *Id.* at 958, 127 S.Ct. 2842.

The Court then considered the principles of *Ford*, noting that whether the *Ford* decision was animated by concerns for the retributive value of the death penalty or the "natural abhorrence" a civilized society feels at executing the insane, the questions posed by *Ford*—the petitioner's ability to "comprehend the reasons" for the punishment or his unawareness of the reasons for the punishment—were undermined by the Fifth Circuit's decision that deemed delusions relevant only with respect to the State's announced reasons for the execution. The Court concluded that it could "find no support elsewhere in *Ford*, including in its discussions of the common law and state standards, for the proposition that a prisoner is automatically foreclosed from demonstrating incompetency once a court has found he can identify the stated reasons for his execution." *Id.* at 959, 127 S.Ct. 2842.

The substantive law in Pennsylvania has hewed to that developed by the U.S. Supreme Court. For example, in *Jermyn*, we posed the competency-to-be-executed question as whether the petitioner suffers from a mental illness which "prevents him from comprehending the reasons for the death penalty or its implications," consistent with *Ford*. *Jermyn*, 709 A.2d at 852; *see also Commonwealth v. Haag*, 570 Pa. 289, 809 A.2d 271, 277 (2002); *Commonwealth v. Bronshtein*, 556 Pa. 545, 729 A.2d 1102, 1104–05 (1999); *In re Heidnik*, 554 Pa. 177, 720 A.2d 1016, 1018 (1998); *Commonwealth v. Jermyn*, 539 Pa. 371, 652 A.2d 821, 824 (1995). This Court has not, however, had the opportunity to revisit the competency-to-be-executed standard following *Panetti* to consider whether further clarification is warranted.

Following *Panetti*, it is clear that the Eighth Amendment requires a petitioner not only to have a factual

understanding of the penalty and the reasons for it, but also a rational understanding of it.[18] Delusions or other psychotic symptoms cannot simply be discounted because the petitioner has a cognitive awareness of his circumstances. Instead, delusions are relevant to determine whether they "put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose." *Panetti*, 551 U.S. at 960, 127 S.Ct. 2842. Accordingly, the appropriate inquiry in a competency-to-be-executed determination must take into account both the factual awareness and the rational understanding of the condemned. Put another way, a court must determine whether the prisoner suffers from a mental illness which prevents him from factually or rationally understanding the reasons for the death penalty or its implications.

Turning to the instant case, we reiterate that this Court reviews the trial court's findings for an abuse of discretion. Furthermore, the credibility determinations made by the fact-finder will be upheld so long as there is adequate record support for them. Considering the credibility determinations made by Judge Augello, we find that there was adequate record support to credit the defense experts' testimony over that of the Commonwealth's experts, as to the points upon which the parties disagreed.

As revealed by our summary of the experts' testimony, there was no disagreement that Banks suffers from a severe mental illness raising a substantial question of competency, which is the first essential predicate for a *Ford* claim.[19] Indeed, there were significant areas of agreement among the

18. A factual understanding refers to the petitioner's cognitive awareness of the impending execution and the State's rationale for the execution, similar to the determination the Fifth Circuit made in *Panetti*. A rational understanding reflects whether the petitioner comprehends the link between the crime and the punishment to be inflicted.

19. The *Panetti* Court indicated that, consistent with due process, state courts could require the petitioner to make a threshold "substantial showing" of incompetency in order to trigger further competency proceedings. 551 U.S. at 949, 127 S.Ct. 2842 (citing *Ford*, 477 U.S. at 426, 424, 106 S.Ct. 2595 (Powell, J., concurring)).

parties' experts regarding Banks' psychosis and delusional and hallucinatory symptoms. The Commonwealth's experts acknowledged the existence of most of the delusions, agreeing that Banks had fixed delusions regarding police involvement in the original murders as well as delusions related to a supposed Department of Corrections conspiracy against him. Five of the experts, including one Commonwealth expert, agreed that Banks' delusions extended to his sentence, since Banks believed that he was "supposed to be exempt" from the sentence of death or that someone or some higher being had "vacated" his sentence of death. Five experts testified that Banks has a fixed delusion that he is not under a sentence of death. Furthermore, to the extent there was a difference of opinion on the ultimate question of competency, the defense experts' testimony countered the testimony of the Commonwealth experts. Specifically, Dr. Sadoff testified that he could not understand the Commonwealth's experts' conclusions given the nature of Banks' psychosis, and Dr. O'Brien testified that the Commonwealth's experts failed to take into account whether the delusions interfered with Banks' rational understanding of the death penalty and the reasons for it. The defense experts also explained their understanding of the Commonwealth's experts' assertion that the delusions had lessened. For example, Dr. Dudley explained that the role delusions play in the life of persons such as Banks may "ebb and flow, not because their belief in the delusion ebb[s] and flows, but because of the defendant's temporal circumstances. So, in other words, there may be circumstances that are occurring that make the importance of the delusional thinking more relevant or less relevant, but the delusional thinking itself is fixed." N.T., 325; *see also id.* at 328 (Dr. Dudley further stating, "he's no more or less delusional at these different times, at least that's my opinion. Now, what he chooses to talk about is a totally different matter. It doesn't have to do with whether the delusions are there or the thought process disturbances are there. It has to do with what's provoked.") N.T., 338.

The remaining question is whether, on this record and in light of Judge Augello's credibility findings, the judge abused his discretion in concluding that Banks was incompetent to be executed. Like the petitioner in *Panetti*, George Banks appears to have a cognitive awareness of the death sentence imposed upon him. He recognizes his responsibility for most of the murders and understands that he was sentenced to death as a result of those crimes. He also appears to understand what execution entails and on some level, acknowledges that he would die as a result of it.[20] He also understands that the stated reason for his death sentence is the multiple murders.

In any event, and mirroring the *Panetti* inquiry, the primary disputed question between the two sides is whether Banks possesses a rational understanding of his execution and the reasons for it. The Commonwealth's experts did not discount that Banks had a fixed delusion that his sentence was vacated, but explained that coexisting with this delusional belief was a rational understanding of the penalty and the reasons for it; the fact that Banks had a cognitive understanding or factual awareness was sufficient, in their view, to deem Banks competent.

On the other hand, the defense experts did not discount that Banks had some factual awareness of the death penalty, but testified that the factual awareness was so intertwined with his delusional belief that the link between his crime and punishment was irrational or illogical. As most coherently

**20.** Whether Banks has a rational understanding that death would result if he were executed is less clear as Dr. Michals testified that Banks understood that the current manner of execution is by lethal injection. Banks, however, also told Dr. Michals that before lethal injection the manner of execution was electrocution. Banks explained that under the former execution manner, he would not have died as a result of the electrocution, but would have been put to sleep, pronounced dead by a doctor, and set free in a different country. Thereafter Dr. Michals did not follow up on this delusional belief to determine whether Banks understood that his execution by lethal injection would result in his death or would result in a similar fate. N.T., 686–87; *see also* N.T., 29 (testimony of Dr. O'Brien repeating same delusional notion held by Banks that electrocution would have resulted in his removal from country instead of death).

explained by Dr. O'Brien on rebuttal, normally the psychosis and cognitive awareness are parallel, which supports the Commonwealth's experts' position. Dr. O'Brien, however, further explained that in this case, the psychosis and factual appreciation had become interwoven, undermining Banks' factual appreciation of the penalty and the reasons for it. Additionally, at least two of the defense experts suggested that Banks believes that the penalty is unrelated to the murders, and instead is part of a conspiracy on the part of the government.

As is often the case when courts are called upon to decide issues involving psychiatry and a party's mental state, the decisional task under *Ford* and *Panetti* is not an easy one. While we do not question that at some level Banks possesses a cognitive awareness of the simple fact of his prospective execution and the reasons for it, Judge Augello's determination that Banks nevertheless is not competent to be executed applied the governing federal law as we understand it. What matters is that, while Banks may have a factual awareness of the death penalty and the reasons for it, as a result of his mental illness, Banks does not have a rational understanding of the death penalty or the reasons for it, as required by *Panetti*. Furthermore, there is no evidence that Judge Augello's conclusion was otherwise manifestly unreasonable, arbitrary, or capricious, or was motivated by partiality, prejudice, bias, or ill will. For these reasons, we conclude that Judge Augello did not abuse his discretion in finding that Banks was currently incompetent to be executed under the Eighth Amendment.

We acknowledge that certain of Judge Augello's absolute statements went farther than the evidence warranted, such as when he found that Banks was "incapable" of rational thought or that it was "impossible" to carry on a logical conversation with him based upon the experts' account at the competency hearing regarding their interactions with Banks during the interviews. Instead, the evidence showed that Banks was capable of factual responses as to many aspects of his life and death and communicated appropriately with all of the experts. Dr. O'Brien stated as much on direct examination when he

testified that, under his new medication regime, Banks was more cooperative and was able to communicate his symptoms better. N.T., 19–20. Additionally, while all of the experts agreed that Banks engaged in loosely disorganized thought and was prone to tangential diversion, they also indicated that he could appropriately respond to questions that were asked of him.[21] What is inescapable, however, is that the experts generally agreed that Banks had a significant number of fixed delusions relating to his crime and punishment and five of the six experts agreed that his delusions extended to his penalty. Thus, although some of Judge Augello's broad findings were unsupported by adequate record evidence, this fact does not detract from his essential finding that Banks currently is incompetent to be executed, and does not prove an abuse of discretion.[22]

—V—

Finally, by supplemental order issued on December 3, 2004, we directed the trial court to consider whether Banks had the mental capacity to initiate clemency proceedings or to designate someone to initiate clemency proceedings on his behalf, at the same time of the competency-to-be-executed hearing. The supplemental order arose out of a separate action filed by Mary Yelland, Banks' mother, in the Commonwealth Court, broadly challenging clemency proceedings in this Common-

21. While all of the experts indicated that Banks was more communicative, cooperative, and better able to respond to questions under his new medications, the conclusions drawn from the "improvement" were a source of disagreement. The defense experts indicated that Banks' ability to communicate highlighted his symptoms even more, indicating that while he could initially respond to a question, when permitted to continue, he rambled incoherently, often diverting the conversation to religious conspiracy topics. Conversely, the Commonwealth's experts attributed Banks' increased ability to communicate and cooperation to the fact that his delusions had decreased and his mental condition had improved.

22. There is no reason at this time to speculate as to whether and how the Commonwealth may apply for a declaration of competency in the event that Banks' mental condition undergoes a material improvement. The rule amendments being considered by our Rules Committees should account for this possibility.

wealth when an alleged incompetent person was involved. Consistent with this Court's order, the parties presented expert testimony on the clemency question and Judge Augello made findings related to this question.

Specifically, the defense experts agreed that Banks did not have the ability to pursue clemency. As succinctly explained by Dr. Sadoff, Banks cannot pursue clemency because "he believes his sentence has been vacated. There's no reason for him to initiate a clemency because that isn't necessary. You can't do it because his sentence is not there. If he had a sentence and he believed that he was going to be sentenced to death, then he could initiate a clemency, but he can't do it now because he says there is no need for it." N.T., 391.

Conversely, the Commonwealth's experts testified that Banks was able to explain the process of clemency and understood that the Governor could overturn his sentence or commute the sentence to life in prison. The Commonwealth experts also testified that Banks was willing to pursue clemency because of his sister (who apparently asked him to do so). N.T., 484–85, 523 (Dr. Mechanick); id. at 697, 703 (Dr. Michals). During cross-examination, however, Dr. Mechanick recognized that Banks would have to provide a factual recitation of the night of the murders, and admitted that his ability to do so might be impaired because of his delusional belief that the police had shot or re-shot some of the victims. N.T., 615–16.

Judge Augello again credited the defense experts' testimony and found that Banks was incompetent to initiate clemency proceedings or to appoint someone to initiate clemency proceedings on his behalf since he suffers from a delusional belief that his sentences have been vacated.

The Commonwealth avers that Banks is competent to pursue clemency proceedings. The Commonwealth again asks this Court to credit the testimony of Drs. Mechanick and Michals, who expressed that Banks understands the process of clemency and that clemency can be used to overturn his sentence or change his sentence to life in prison. The Com-

monwealth argues that the testimony and conclusions of the defense experts were without foundation, since the defense experts simply relied on their determination that Banks believed his sentences of death were vacated in support of their conclusion that he was unable to pursue clemency proceedings.

Banks does not specifically respond to the clemency argument except in a general manner, reiterating, where relevant, that his experts should be credited and that their testimony supports Judge Augello's conclusion that he is not competent to pursue clemency proceedings.

Judge Augello made findings related to the clemency question in response to this Court's December 3, 2004 order. Upon closer consideration, however, it is not apparent that this Court needs to, may, or should reach this issue. The question of clemency is primarily, if not exclusively, one for the Executive, not the courts. Indeed, the pardoning power arises within an article of the Pennsylvania Constitution enumerating the powers of the Executive. *See* PA. CONST. art. IV, § 9. Moreover, there is an executive process in place for consideration of such claims. *See* 37 Pa.Code § 81.201–81.304. Notably, that process allows for clemency applications by certain third parties, including "a legal guardian, next friend or other person authorized by law to act on behalf of the applicant," *id.* at § 81.282; thus, it is not apparent why competency would be a question. To our knowledge, no clemency process is underway. Given our finding of current incompetency for purposes of execution, the ripeness concerns, and the separation of powers concerns, we will not pass upon the question. Judge Augello's findings on the question of clemency, therefore, stand as neither accepted nor rejected.

—VI—

In sum, nothing implicated by the narrow questions currently before the Court operate to diminish the enormity of Banks' crimes. There has never been a question of whether Banks committed these horrific murders; his defense at trial, rejected by a jury of his peers, rested on his asserted mental illness.

The current substantive question before the Court involves implementation of a federal constitutional restriction upon actual execution of the insane. It appears that Banks is in a different place mentally than he was nearly thirty years ago when he committed his crimes and when he was tried. Perhaps that deterioration provides some solace to Banks, even though it provides no solace, nor closure, for the families of his victims.

For the reasons stated herein, this Court denies the Commonwealth's exceptions and accepts Judge Augello's determinations that George Banks is presently incompetent to be executed.

Plenary jurisdiction relinquished.

Justices SAYLOR, EAKIN, BAER, TODD, McCAFFERY and ORIE MELVIN join the opinion.

