**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 40 EAP 2018 |
| | : | |
| Appellee | : | Appeal from the Superior Court entered |
| | : | on 6/27/18 at No. 927 EDA 2016 |
| | : | affirming the order entered on 3/3/16 in |
| v. | : | the Court of Common Pleas, |
| | : | Philadelphia County, Criminal Division, |
| | : | at No. CP-51-CR-1300424-2006 |
| KAREEM JOHNSON, | : | |
| | : | |
| Appellant | : | ARGUED: September 10, 2019 |

***OPINION***

**CHIEF JUSTICE SAYLOR**                              **DECIDED:  May 19, 2020**

The question presented pertains to the scope of protection offered by the Pennsylvania Constitution's Double Jeopardy Clause.  We consider whether that provision bars retrial where the Commonwealth obtains a conviction based on false evidence and its misconduct, while not undertaken with the intent to deny the defendant a fair trial, nevertheless stems from prosecutorial errors that rise substantially above ordinary negligence.

**I. Background**

**A. Underlying events, trial, and direct appeal**

In 2002, the victim in the present case, Walter Smith, told police that Clinton Robinson had killed Margaret Thomas.  Later that year, Smith himself was killed when he was shot twelve times outside a Philadelphia bar.  Based on ballistics evidence, the

police concluded that multiple individuals had acted in concert to kill Smith.  Police also recovered a red baseball cap, which was located in the middle of the street approximately nine feet from Smith's body.  Photos of the scene only showed this one cap.  The cap was assigned property receipt number 9001079.[1]

Shortly after the incident, Debbie Williams, a friend of Smith's who was with him on the night in question, went to the police station and was questioned by the assigned detective, James Burns.  She provided a statement indicating the following.

Smith and Ms. Williams made a brief stop at a bar in Philadelphia during the early morning hours of December 15, 2002.  When they left, there were seven to ten persons on the sidewalk or street outside the bar.  As she and Smith went to get into Smith's van, she walked to the passenger door while Smith walked around to the driver's side.  Just then, a young black male wearing a red article of clothing and a baseball cap ran past her in front of the van toward Smith.  Shots rang out, whereupon Ms. Williams ducked down and did not see the actual shooting.  When the shots began, the individuals outside the bar ran away toward Somerset Street.  After the gunshots ceased, Ms. Williams saw the same person who had run past her flee the scene, also in the direction of Somerset Street.[2]  Ms. Williams went to where Smith's body was lying in the street and picked up Smith's black baseball cap, which had a bullet hole in it.  The police arrived shortly thereafter and transported her to the police station.

---

[1] An officer explained at trial that a property receipt is a typed report concerning an item of evidence, with a unique number on it.  The number then functions as a computer database key for the police to view information about the item, such as where it came from, which officer obtained it, where it is currently stored, and any data developed through forensic analysis.  *See* N.T., June 20, 2007, at 130.

[2] Somerset Street is near the intersection where the bar was located.  At trial Ms. Williams added that the red baseball cap's location after the shooting was also in the direction of Somerset Street from Smith's body.  *See* N.T., June 20, 2007, at 168.

At the station, Ms. Williams gave the black cap to Detective Burns and explained that Smith had been wearing it when he was shot. This cap was assigned property receipt number 2425291, and was submitted to the crime lab for testing. The testing revealed the presence of Smith's blood under the brim.

The case remained unsolved until 2005, when Bryant Younger, a jailhouse informant who was under indictment on a federal narcotics offense, told police he had overheard Appellant make statements implicating himself in Smith's murder. Younger admittedly supplied this information solely in hopes of obtaining leniency when he was sentenced in federal court. *See* N.T., June 20, 2007, at 85-86 (reflecting the Commonwealth's acknowledgement in this regard); *see also id.* at 96-97, 100, 104, 110-112 (recording Younger's testimony that this was his sole motive). Regardless, in light of the information, the police obtained a sample of Appellant's DNA and submitted it together with the red cap for testing. The testing revealed that Appellant was a contributor to the DNA in the sweatband of the red cap.

Thereafter, the Commonwealth proceeded on the understanding that there was only one baseball cap involved – the red one – and that it contained both Smith's blood and Appellant's DNA. In fact, as explained, the red cap had Appellant's DNA, whereas the black cap contained Smith's blood; neither cap had DNA from both individuals. Appellant was ultimately arrested and charged with first-degree murder, conspiracy, and possessing an instrument of crime.

The matter went to trial in June 2007 as a capital case. The Commonwealth's theory as to motive was that Appellant had participated in killing Smith to prevent him from testifying against Clinton Robinson in the Margaret Thomas homicide case. The evidence tended to show that Appellant was a friend, or at least an acquaintance, of Robinson's. Moreover, one of the statements Younger claimed to have overheard

included a suggestion by Appellant that if it were not for his (Appellant's) actions, Robinson would not be getting out of jail.

At trial, the Commonwealth's crucial piece of physical evidence was the red baseball cap. Unaware of its mistake regarding its possession of two caps from the crime scene rather than one – and unaware that there was no evidence suggesting Smith's blood was on the red cap – the prosecuting attorney repeatedly indicated in his opening statement that Appellant "got in real close" to shoot Smith essentially at point blank range, N.T., June 20, 2007, at 78, 79, 87, thus accounting for Smith's blood supposedly being on the underside of the red cap's brim. The prosecutor continued:

> So now with, I would submit, as certain evidence as can you [sic] find we know that that hat that was left at that scene in the middle of the street has Kareem Johnson's sweat on it *and has Walter Smith's blood on it*. Based on that evidence, we come to trial.

*Id.* at 88 (emphasis added).

In support of the Commonwealth's position at trial that Appellant was one of the shooters and he shot Smith at close range, the lead crime-scene investigator, Officer William Trenwith, testified that when he recovered the red cap from the scene he saw drops of fresh blood underneath the cap's brim. *See id.* at 116. The officer also noted that he had never seen a case in which blood had spattered the distance from Smith's body to where the red cap was found at the scene – suggesting that the person who wore the cap had fired his weapon significantly closer to Smith than where the cap was located. The Commonwealth also presented the testimony of Lori Wisniewski, the forensic scientist who performed the DNA testing. She stated that Walter Smith's blood and Appellant's DNA were both found on "the hat." N.T., June 21, 2007, at 160-164.[3]

---

[3] Although the Commonwealth was in possession of some forensic evidence, it did not, prior to trial, request a criminalistics report, which would have reflected a list of the items tested and the results of those tests. *See infra* note 5 and associated text.

As well, the Commonwealth elicited testimony from Bryant Younger, who recounted Appellant's jailhouse statements.

Appellant never challenged the underlying premise that there was only one hat, and both parties construed the evidence as relating solely to the red cap. *Accord* Brief for Commonwealth at 5.[4] Thus, in his summation Appellant was relegated to arguing that, despite the presence of both men's DNA on the same hat, no eyewitness saw Appellant wear the hat at or near the time of the killing or otherwise connected him with the crime scene, *see* N.T., June 22, 2007, at 23-24, 42-45; there were other contributors to the DNA in the hat's sweatband, *see id.* at 55-56; and, in any event, the DNA match between the cap's sweatband and the sample provided by Appellant was equivocal. *See id.* at 38, 40.

In his closing argument, the prosecutor took issue with the concept that the DNA match was equivocal, noting that, per Ms. Wisniewski's explanation, the odds of the DNA coming from someone other than Appellant were too small to be realistic. *See id.* at 60. Responding to Appellant's observation that no eyewitness identified Appellant as the shooter or even stated that the killer wore the red cap, he continued:

> Do you know who says the killer wore the hat? Walter Smith says the killer wore the hat. He says it with his blood. There is no other way Walter Smith's blood could have gotten on the underside of this hat . . . unless the person who killed Walter Smith was standing close to him while he shot and killed him . . .. So once you know that, we know this: The killer wore that hat. . . .

---

[4] As noted, in Ms. Williams' statement, which the Commonwealth caused to be read for the jury, she explained that she picked Smith's hat up from the street after the shooting. *See* N.T., June 20, 2007, at 178, 226. For reasons that remain unclear, however, this too apparently did not give rise to a suspicion by anyone at trial that there might be two hats involved.

This is the killer's hat.  This is the killer's hat.  The crime scene tells you that.  The physical evidence tells you that. . . .  Physical evidence has no bias.  Physical evidence cannot lie. . . .  It is just out there.  It is there and it says what it says. . . .  This overwhelming physical evidence says that killer's hat was left out on the scene. . . .

DNA evidence . . . says, hey, this is Kareem Johnson's sweat on the sweatband, he is the major contributor, *the very hat that has Walter Smith's blood on the brim*.

*Id.* at 66-68, 89 (emphasis added).

The jury convicted Appellant on all counts and set the penalty at death.  This Court affirmed the judgment of sentence on direct appeal.  *See Commonwealth v. Johnson*, 604 Pa. 176, 197, 985 A.2d 915, 928 (2009).

**B. Post-conviction relief and subsequent pre-trial motions**

Appellant filed a counseled, amended petition under the Post Conviction Relief Act.  *See* 42 Pa.C.S. §§9541-9546 ("PCRA").  Responding to a defense open-records request, Gamal Emira of the criminalistics lab generated a forensics report in 2011, reflecting that two hats, a red one and a black one – each with a distinct property receipt number – had been analyzed in connection with the Commonwealth's case, and that Smith's blood was only found on the black hat.[5]  The Commonwealth thereafter agreed that Appellant was entitled to a new trial, and the court entered an order to that effect in April 2015.  The Commonwealth later withdrew its notice of intent to seek the death penalty, making this a non-capital case going forward.

---

[5] The criminalistics lab is a police laboratory that analyzes items of physical evidence through DNA testing and other scientific processes.  It communicates test results and generates reports as requested by the Commonwealth or by a defense attorney.  *See* N.T., June 20, 2007, at 87; N.T., June 21, 2007, at 144; N.T., Oct. 12, 2012, at 4-5; *see also* N.T., Jan. 27, 2016, at 134-35 (discussing defense-initiated requests).

Meanwhile, Appellant filed a supplemental discovery motion, to which he attached the 2011 criminalistics report by Gamal Emira. The court held a hearing on the motion that spanned several days in late 2015 and early 2016. During the hearing, the court allowed Appellant to develop evidence to support a potential motion to bar retrial based on double-jeopardy principles as reflected in, *inter alia*, the state Charter. *See* PA. CONST. art. 1, §10 ("[N]o person shall, for the same offense, be twice put in jeopardy of life or limb[.]"). Thus, Appellant called as witnesses several individuals who were involved with the Commonwealth's presentation of the case at the 2007 trial or who had represented the Commonwealth in post-conviction proceedings. These included: Officer Trenwith; Detective Burns; Lori Wisniewski (whose name had by then been changed to Lori Citino); Gamal Emira; Attorney Michael Barry, who represented the Commonwealth at trial; and Attorney Tracey Kavanagh, who represented the Commonwealth during post-conviction proceedings.

In questioning these witnesses, Appellant was able to uncover in some detail the extent of the Commonwealth's mishandling of the physical and DNA evidence during his trial. Of particular note, the Commonwealth misunderstood its own evidence and conflated the findings relating to the red and black caps. Although separate property receipt numbers had been assigned to the two hats, this did not prompt the Commonwealth to investigate whether its trial witnesses were discussing two distinct caps – or, alternatively, why a single red cap was associated with multiple property receipts. Even the Commonwealth's forensic scientists who authored, or supervised generation of, the scientific reports did not realize at trial that there were two caps involved.

Further, Officer Trenwith, who processed the crime scene and who testified as a fact witness at trial – indicating that he personally saw fresh drops of blood on the red

cap – noted during the hearing on the supplemental discovery motion that his trial testimony concerning the red cap was based on an assumption:

> Q. Did it occur to you that you were testifying about something that you had not documented in any of your reports?
>
> A. When – when I testified, I was going *on the assumption*, which I shouldn't have done, that there was, in fact, blood on it, that's why I said it. But as far as my report is concerned, it does not state that there was actual drops of blood.

N.T., Jan. 26, 2016, at 37 (emphasis added). The officer's assumption in this regard appears to have stemmed from his having heard from a DNA scientist at the time of the preliminary hearing that blood stains were found on a hat (in reality, the black hat). *See, e.g.*, *id.* at 14-16, 22. Still, this did not account for the officer's description at trial that the blood drops were located underneath the brim of the hat, that the hat was the red one, that he personally saw the blood drops, and that they appeared to be fresh when he arrived at the crime scene. *See* N.T., June 20, 2007, at 116. Moreover, none of the photos taken by the officer or his crime-scene partner showed the underside of the red hat's brim. *See* N.T., Jan. 27, 2016, at 115.

In light of all of the evidence adduced at the hearing, Appellant moved to bar retrial. The court heard oral argument on the motion in March 2016. During Appellant's portion of the argument – which took the form of a back-and-forth conversation with the court – Appellant highlighted the harm caused by the factually inaccurate trial testimony concerning fresh drops of blood under the brim of the red hat. *See* N.T., Mar. 3, 2016, at 10. The court responded by expressing that it was

> unfathomable to me to believe that what Officer Trenwith saw on the hat were, quote, fresh drops of blood. It's unfathomable not only because it's not referred to on the receipt that he made out, it's unfathomable because here is an experienced crime scene investigator who's taking pictures, which include pictures of the hat – at every point where there's a picture of

the hat taken, the hat is in the position it was on the street, brim down. If you're a first-year investigator and you have seen fresh drops of blood on the hat, you're going to at least in one picture flip the hat over and make sure there's a picture of that.

*Id.* at 10-11.

Appellant also summarized the mistakes made by Detective Burns, Attorney Barry, and others associated with the prosecution. He observed that they all made essentially the same error in conflating the two hats, notwithstanding that the property receipt numbers were different on the papers showing the lab results for the two hats, and that the Commonwealth possessed all of the physical evidence and the results of the forensic testing supplied by the criminalistics lab.

Appellant argued that, whether those errors reflected an intentional subversion of the truth-determining process, or mere recklessness, they led to Appellant being confined on death row for nine years based on a trial that the Commonwealth later conceded was constitutionally inadequate. He urged that double jeopardy norms should be construed to preclude retrial in such circumstances, particularly as the Commonwealth had seen fit to try a capital case based on DNA evidence without ordering a criminalistics report – which would have alerted the prosecution to the fact that two hats were involved. *See id.* at 15-19.

For its part, the Commonwealth admitted that it had made substantial errors during the trial. It argued, however, that retrial should not be barred because it did not act in bad faith and any subversion of the truth-determining process was unintentional. In this regard, it observed that at trial the discrepancies it overlooked were in plain view of the defense as well, and defense counsel did not notice the error concerning the existence of two caps. Thus, the Commonwealth stressed, the mistakes it made did not reflect an affirmative intent on its part, or a conspiracy by government actors, to conceal material information from the defense. *See id.* at 22-28.

In ruling from the bench, the common pleas court expressed that it was "more than negligence" that the Commonwealth took a capital case to trial "without even awaiting a full criminalistics DNA analysis." The court characterized the prosecution's handling of the evidence as "extremely negligent, perhaps even reckless." It added that the Commonwealth's subsequent "exaggeration" of that evidence at trial was "intolerable." *Id.* at 38-40. Addressing Officer Trenwith, who was present in court for the ruling, *see id.* at 11, the court continued:

> I am 100 percent certain, sir, that you did not see, when you first looked at that cap, what you really or reasonably thought were, quote, fresh drops of blood, unquote, because I know your work. And I know that there would have been a lot more evidence with regard to that cap and a lot more detail in the property receipt if you actually thought at the time that that's what you had seen.
>
> But I absolutely do believe that at the time of the preliminary hearing, it's extremely possible that no one, not Officer Trenwith, certainly not Assistant District Attorney Barry, understood that there were two separate hats.

*Id.* at 38-39.

In the end, while describing the trial as a "farce," the court nonetheless credited Mr. Barry's testimony to the effect that the Commonwealth's myriad errors did not reflect bad faith or intentional misconduct. The court concluded that

> to turn this gross series of almost unimaginable mistakes by experienced police officers and an experienced prosecutor into the kind of bad faith intentional misconduct that would permit a judge to bar further prosecution I would have to disbelieve completely all of Mr. Barry's testimony about what he did, what he didn't do, why he did what he did, why he didn't do what he didn't do.
>
> On the contrary, I find his testimony to have been completely credible. I find that an experienced . . . prosecutor made an almost unimaginable mistake, that it was a mistake which dovetailed with other mistakes that

had been made by the officers and the detective in the case, and it produced a trial that was a farce.

The remedy in Pennsylvania for a trial that was a farce, generally, is a new trial. Prosecution . . . is barred under Pennsylvania law only if there are additional elements of intentional misconduct and bad faith on the part of the prosecution, which I do not find to have existed here.

*Id.* at 40-41.

Accordingly, the court denied the motion to bar retrial, although it also stated on the record that the double-jeopardy issue was non-frivolous. *See id.* at 41, 44, 46.

### C. Interlocutory appeal from denial of motion to bar retrial

On interlocutory appeal, the Superior Court affirmed in a non-precedential decision. The court relied on its prior decision in *Commonwealth v. Adams*, 177 A.3d 359 (Pa. Super. 2017), for the position that double-jeopardy principles only bar retrial where there is proof that the prosecutorial misconduct in question was committed with an intent to either provoke a mistrial or deny the defendant a fair trial. *See Commonwealth v. Johnson*, No. 927 EDA 2016, 2018 WL 3133226, at *5 (Pa. Super. June 27, 2018) (citing *Adams*, 177 A.3d at 371). Characterizing the prosecution's actions as "egregious" and "intolerable," and crediting Appellant's description that the Commonwealth had acted with "deliberate indifference" to the nature of the evidence during trial, the intermediate court nonetheless concluded that such conduct "did not rise to the level of intentionality required to bar further prosecution." *Id.* at *5-*6.

### D. Discretionary review by this Court

One aspect of the present dispute, as reflected in the parties' briefs, relates to the nature of the issue or issues as to which we granted review. In particular, the parties disagree as to whether this Court has accepted any issue pertaining to the standard of review that should be applied to the common pleas court's factual finding

that the Commonwealth's misconduct was not specifically intended to deprive him of a fair trial.  To resolve that question, it is helpful at this juncture to set forth the questions in terms of Appellant's original phrasing and this Court rephrasing.

Appellant presented two issues for our consideration in his petition for allowance of appeal:

> 1) Did the record support the finding of the lower court that "an almost unimaginable mistake that . . . produced a trial that was a farce," given that the experienced prosecutor and the experienced assigned detective both made the same mistake, and the experienced crime scene officer testified to the exact same mistake, which proved completely false.
>
> 2) The Superior Court labeled the Commonwealth's behavior intolerable and egregious, and described its handling of the prosecution as "deliberate indifference."  Was the Commonwealth's deliberate indifference to the preparation and presentation of the instant capital case, which resulted in egregious mistakes and "misrepresentation of the physical evidence," designed to deprive Kareem Johnson of a fair trial?

*Commonwealth v. Johnson*, No. 339 EAL 2018, Petition for Allowance of Appeal, at 3-4 (ellipsis in original, footnote omitted), *reprinted in* Reply Brief for Appellant at 4 n.2.  This Court issued an order which stated that the petition "is GRANTED," and continued:

> The issue, rephrased for clarity, is:
>
> Should the Commonwealth's misrepresentation of physical evidence in Petitioner's first trial bar retrial on double jeopardy grounds, notwithstanding the trial court's finding that the Commonwealth's misconduct was unintentional?

*Commonwealth v. Johnson*, ___ Pa. ___, 199 A.3d 346 (2018) (*per curiam*).

Although the Commonwealth disputes that the first question posed in the petition for allowance of appeal is subsumed within this Court's rephrasing, *see* Brief for Commonwealth at 15 n.4, the order reflects an unqualified grant as it contains no limiting language.  Where this Court intends to deny review as to a subset of the

questions raised in the petition for allowance of appeal, it qualifies its action by stating that the petition is granted, "limited to" certain issue(s), and that "allocatur is denied" as to the remaining issues. *See, e.g.*, *Estate of Benyo v. Breidenbach*, ___ Pa. ___, 220 A.3d 1062 (2019) (*per curiam*); *Commonwealth v. Peck*, ___ Pa. ___, 218 A.3d 374 (2019) (*per curiam*). No such limiting language appears in the grant order quoted above, and the "notwithstanding" clause of the rephrased question can fairly be read to subsume the record-support issue. That clause is, notably, framed with reference to the common pleas court's *finding* that the misconduct was unintentional, and not in terms of the *fact* that it was unintentional. Thus, we will address both issues.

## II. Record support

Appellant opens his advocacy by suggesting that this Court disapprove the common pleas court's factual finding that the prosecution's mistakes were not made with the intent of depriving him of a fair trial, but with some lesser scienter such as gross negligence or possibly recklessness. Appellant's argument is essentially that the types and combination of errors ultimately uncovered in this matter were so numerous and severe that they had to have been committed intentionally, and thus, we should reject the common pleas court's contrary finding as clearly erroneous. *See* Brief for Appellant at 16-30.

The Commonwealth's failure to grasp, during the trial or the proceedings leading up to it, that there were two hats involved in this matter does appear to have been the result of an accumulation of a series of mistakes. Still, there is little in the record to suggest the prosecution was aware of these mistakes at the time they were made. Nor is there anything tending to reflect a conspiracy on the part of the various witnesses at the hearing in late 2015 and early 2016 to conceal any such awareness from the common pleas court. To the contrary, the mistakes, which even defense counsel did

not notice notwithstanding the discrepancy in property receipt numbers, had their genesis in what appears to have been a highly unusual circumstance: a bystander – Debbie Williams – removed one of the hats from the crime scene after the shooting but before the police arrived, and then gave it to the assigned detective at the police station later that night.[6]

In ruling on Appellant's motion to bar retrial, moreover, the common pleas court expressly considered the testimony of all the witnesses who were involved in some way with the original prosecution. This included, most notably, the testimony of the lead prosecuting attorney, Mr. Barry, in which he admitted that he had made several significant errors. *See, e.g.*, N.T., Jan. 27, 2016, at 55 ("I should have noticed that the property receipts were different. That's absolutely, 100 percent, my fault, and I should have caught that."). The court credited the prosecutor's description, including the clear implication that his errors were unintentional. *See* N.T., Mar. 3, 2016, at 37 ("I find [Mr. Barry's] testimony to have been completely credible.").

A fact-finder who hears witness testimony first-hand is able to take into account not only the words that are spoken and transcribed, but the witnesses' demeanor, tone of voice, mannerisms, and the like. *See generally Daniels v. WCAB (Tristate Transp.)*, 574 Pa. 61, 76-77, 828 A.2d 1043, 1052 (2003) (listing other non-verbal cues that may

---

[6] We are troubled that the lead crime scene investigator testified that he saw fresh drops of blood on the red cap when no blood was found on that hat. However, he did see a hat at the scene, he was informed prior to testifying by a forensic scientist that blood was found on "the hat," and there is no suggestion he was aware that a hat with blood had been removed from the scene before he arrived. Thus, it is not entirely clear that the investigator's testimony amounted to a conscious lie.

As well, there is no indication that the Commonwealth's attorney was aware that the testimony concerning the supposed fresh drops of blood on the red hat was false. Still, the investigator's testimony is of some present significance, as explained below.

be available to the first-hand observer (quoting *Commonwealth v. Story*, 476 Pa. 391, 416, 383 A.2d 155, 168 (1978))).  Accordingly, appellate courts, which must "rely[] upon a cold record," *Armbruster v. Horowitz*, 572 Pa. 1, 10, 813 A.2d 698, 703 (2002) (internal quotation marks and citation omitted), review deferentially the findings of fact reached by such individuals.  *See Commonwealth v. Banks*, 612 Pa. 56, 81, 29 A.3d 1129, 1144 (2011) (observing that a fact-finder's credibility determinations are to be upheld where there is adequate record support for them); *see also Commonwealth v. Sanchez*, 614 Pa. 1, 27, 36 A.3d 24, 39 (2011).[7]

We do not mean to suggest that such review is blindly deferential, and hence, not all prosecutorial claims of inadvertence must be believed by appellate courts.  Thus, in *Commonwealth v. Virtu*, 495 Pa. 59, 432 A.2d 198 (1981), a defense motion for a mistrial was granted after the Commonwealth called a defense-associated witness who invoked his Fifth Amendment privilege against self-incrimination in the presence of the jury.  In a subsequent hearing on the defendant's motion to bar retrial on double-jeopardy grounds, the prosecutor asserted that he did not realize the witness would do so, whereupon the common pleas court credited the prosecutor's claim and denied the relief.  On appeal, this Court found it clear from the record that the prosecutor's assertion was untruthful and that he had acted in bad faith.  *See id.* at 65 n.8, 432 A.2d at 201 n.8.  For example, it was a matter of record that the Commonwealth's attorney had previously lied to the trial judge at side-bar about whether the witness was the

---

[7] In *PennDOT v. O'Connell*, 521 Pa. 242, 555 A.2d 873 (1989), the Court went so far as to suggest that, where the testimony of two witnesses is in conflict, a trial court's credibility determinations made to resolve the conflict is entirely insulated from review. *See id.* at 248, 555 A.2d at 875 (expressing that issues of credibility and the resolution of conflicting evidence are left to the trial court and "not our appellate courts").  Even that precept has its limits, however, such as where the credited testimony is undeniably irrational or provably false.

same person who had invoked his Fifth Amendment rights at a pre-trial suppression hearing. As well, the witness's attorney had informed the prosecutor during trial that the witness would do so again if he was called to testify. Based on such factors, this Court ultimately reversed the trial court's order denying the defense motion to bar retrial, and discharged the defendant due to the objective record evidence of prosecutorial bad faith. *See id.* at 70, 432 A.2d at 204.

In the present matter, by contrast, the common pleas judge who ultimately denied the motion to bar retrial personally heard extensive testimony from numerous witnesses involved in the prosecution. Additionally, he actively questioned many of the witnesses himself. After that lengthy process was complete, and in consideration of all of the evidence, he credited the prosecutor's testimony and found that the Commonwealth had not acted with the intent to deprive Appellant of a fair trial. Unlike in *Virtu*, there is no basis in the record to overturn the judge's credibility determination or his ultimate factual finding concerning the Commonwealth's motives. That being the case, the record support for the common pleas court's credibility determination is the extensive testimony itself.

### III. Scope of double jeopardy protections

We now turn to whether the court properly denied Appellant's motion to preclude retrial on jeopardy grounds. The federal Double Jeopardy Clause, *see* U.S. Const. amend. V (stating no person shall "be subject for the same offence to be twice put in jeopardy of life or limb"), applies to the States through the Fourteenth Amendment. *See Benton v. Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 2062 (1969). It thus represents the constitutional "floor," *Commonwealth v. Edmunds*, 526 Pa. 374, 388, 586 A.2d 887, 894 (1991), for purposes of Pennsylvania's counterpart provision. Before September 1992, Pennsylvania's double jeopardy protections had been viewed as coextensive with

those of the Fifth Amendment in light of "identical textual and policy considerations." *Commonwealth v. Simons*, 514 Pa. 10, 14, 522 A.2d 537, 540 (1987) (citation omitted); *see Commonwealth v. Sojourner*, 513 Pa. 36, 45 n.6, 518 A.2d 1145, 1149 n.6 (1986); *Commonwealth v. Lively*, 530 Pa. 464, 467, 610 A.2d 7, 8 (1992) (citing, *inter alia*, *Commonwealth v. Kunish*, 529 Pa. 206, 207, 602 A.2d 849, 849 (1992)).

The Double Jeopardy Clause "protects a defendant in a criminal proceeding against multiple punishments or repeated prosecutions for the same offense." *United States v. Dinitz*, 424 U.S. 600, 609, 96 S. Ct. 1075, 1080 (1976); *see also United States v. DiFrancesco*, 449 U.S. 117, 129, 101 S. Ct. 426, 433 (1980) (explaining that the Double Jeopardy Clause protects against a second prosecution after acquittal, a second prosecution after conviction, and multiple punishments for the same offense (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076 (1969))). Among its purposes are to preserve the finality and integrity of judgments and to deny to the prosecution "another opportunity to supply evidence which it failed to muster in the first proceeding." *DiFrancesco*, 449 U.S. at 128, 101 S. Ct. at 432-33 (internal quotation marks and citations omitted).

Insofar as individual rights are concerned, the Clause protects a defendant's interest in having his fate decided by his first jury. *See Dinitz*, 424 U.S. at 609, 96 S. Ct. at 1080. It is grounded on the concept that no person "should be harassed by successive prosecutions for a single wrongful act and that no one should be punished more than once for the same offense." *Commonwealth v. Starks*, 490 Pa. 336, 339, 416 A.2d 498, 499 (1980) (citing *United States v. Wilson*, 420 U.S. 332, 342-43, 95 S. Ct. 1013, 1021 (1975)).

Still, federal jurisprudence has clarified that the Double Jeopardy Clause does not require the government to vindicate its interest in law enforcement through a single

proceeding for each offense. *See, e.g.*, *Wade v. Hunter*, 336 U.S. 684, 688-89, 69 S. Ct. 834, 837 (1949). Thus, retrial is generally allowed where the first proceeding ends in a mistrial or the initial conviction is set aside on appeal, *see United States v. Jorn*, 400 U.S. 470, 483-84, 91 S. Ct. 547, 556 (1971) (plurality); *United States v. Tateo*, 377 U.S. 463, 465, 84 S. Ct. 1587, 1589 (1964) (citing, *inter alia*, *United States v. Ball*, 163 U.S. 662, 671-72, 16 S. Ct. 1129, 1195 (1896)), unless the conviction is overturned due to evidentiary insufficiency. *See Burks v. United States*, 437 U.S. 1, 18, 98 S. Ct. 2141, 2150-51 (1978); *Commonwealth v. Gibbons*, 567 Pa. 24, 28-29, 784 A.2d 776, 778 (2001); *see also* 18 Pa.C.S. §109 (providing a statutory bar to retrial in some situations).

Prior to the Supreme Court's decision in *Oregon v. Kennedy*, 456 U.S. 667, 102 S. Ct. 2083 (1982), the limiting principle was expressed in terms of prosecutorial overreaching – that is, misconduct intended to provoke a defense motion for a mistrial or actions otherwise taken in bad faith to harass or unfairly prejudice the defendant. *See Lee v. United States*, 432 U.S. 23, 34, 97 S. Ct. 2141, 2147 (1977). The concept was applied as a double-jeopardy litmus by federal courts as well as this Court where the first proceeding ended before a verdict was reached, *see, e.g.*, *Jorn*, 400 U.S. at 484, 91 S. Ct. at 556-57*; Mitchell v. Smith*, 633 F.2d 1009, 1011-12 (2d Cir. 1980), or where it resulted in an unsustainable conviction. *See, e.g.*, *United States v. Phillips*, 600 F.2d 186, 187 (9th Cir. 1979) (*per curiam*); *Starks*, 490 Pa. at 341, 416 A.2d at 500; *cf. Hawk v. Berkemer*, 610 F.2d 445, 448 n.4 (6th Cir. 1979) (in *dicta*, stating that, after the reversal of a conviction based on an invalid guilty plea, double jeopardy bars further prosecution where the initial plea was illegal and arose from prosecutorial coercion involving bad faith or overreaching).

In *Kennedy* the Supreme Court disapproved further use of the "overreaching" test, expressing that it was unworkable due to the lack of adequate standards. *See*

*Kennedy*, 456 U.S. at 675, 102 S. Ct. at 2089. Instead, the Court held, the Fifth Amendment immunizes the defendant from retrial only where the government's actions were "intended to 'goad' the defendant into moving for a mistrial." *Id.* at 676, 102 S. Ct. at 2089.

This Court adopted the *Kennedy* rule in *Commonwealth v. Simons*, 514 Pa. 10, 522 A.2d 537 (1987), again referencing that Pennsylvania's protections were coterminous with those of the Fifth Amendment. *See id.* at 14, 522 A.2d at 540 (citing, *inter alia*, *Commonwealth v. Hogan*, 482 Pa. 333, 393 A.2d 1133 (1978)). Accordingly, *Simons* stated that, "henceforth double jeopardy will attach only to those mistrials which have been intentionally caused by prosecutorial misconduct." *Simons*, 514 Pa. at 16, 522 A.2d at 540.

In *Simons*, this Court noted that it had previously granted a new trial due to misconduct involving prosecutorial concealment of information that could have helped the defendant at trial. *See id.* at 12-13, 522 A.2d at 539. The Court found, however, that the Commonwealth had not acted in an attempt to provoke a mistrial, and hence, that the jeopardy bar was not implicated. *See id.* at 20, 522 A.2d at 542.

Concurring in the result, Justice Flaherty, later Chief Justice, laid the groundwork for this Court's subsequent extension of the *Kennedy* rule which, under the "goading" rubric, is necessarily limited to misconduct known to the defendant at trial. Justice Flaherty suggested that there was no reason why clandestine misconduct, including attempts to hide information favorable to the defendant, should be any less capable of raising the double jeopardy bar, so long as the misconduct involved the type of "overreaching" identified in the pre-*Kennedy* timeframe. *See id.* at 21-23, 522 A.2d at 543-44 (Flaherty, J., concurring). *See generally Commonwealth v. Martorano*, 559 Pa.

533, 542, 741 A.2d 1221, 1225 (1999) (Saylor, J., dissenting) (discussing Justice Flaherty's concurrence).[8]

Subsequently, in *Commonwealth v. Smith*, 532 Pa. 177, 615 A.2d 321 (1992), this Court construed Pennsylvania's double-jeopardy provision as supplying broader protections than its federal counterpart as construed in *Kennedy*. In *Smith*, the defendant was convicted of first-degree murder, but this Court awarded a new trial on the grounds that impermissible hearsay evidence had been admitted at trial. Based on

---

[8] Some federal appellate courts have embraced similar reasoning, finding that double-jeopardy precepts are applicable where the prosecutor conceals crucial information with the goal of preventing an anticipated acquittal:

> The prosecutor who acts with the intention of goading the defendant into making a mistrial motion presumably does so because he believes that completion of the trial will likely result in an acquittal. That aspect of the *Kennedy* rationale suggests precluding retrial where a prosecutor apprehends an acquittal and, instead of provoking a mistrial, avoids the acquittal by an act of deliberate misconduct. Indeed, if *Kennedy* is not extended to this limited degree, a prosecutor apprehending an acquittal encounters the jeopardy bar to retrial when he engages in misconduct of sufficient visibility to precipitate a mistrial motion, but not when he fends off the anticipated acquittal by misconduct of which the defendant is unaware until after the verdict. There is no justification for that distinction.

*United States v. Wallach*, 979 F.2d 912, 916 (2d Cir. 1992); *see also United States v. Gary*, 74 F.3d 304, 315 (1st Cir. 1996); *State v. Colton*, 663 A.2d 339, 346 (Conn. 1995); *State v. Marti*, 784 A.2d 1193, 1197 (N.H. 2001) (expressing that the *Wallach* extension is consistent with *Kennedy*'s underlying purpose to bar retrial when the prosecutor acts "with the intent 'to subvert the protections afforded by the Double Jeopardy Clause'" (quoting *Kennedy*, 456 U.S. at 676, 102 S. Ct. at 2089)); *State v. Lettice*, 585 N.W.2d 171, 180 (Wis. Ct. App. 1998); *see also People v. Batts*, 68 P.3d 357, 380 (Cal. 2003) (discussing the *Wallach* extension with approval). *See generally* James F. Ponsoldt, *When Guilt Should be Irrelevant: Government Overreaching as a Bar to Reprosecution Under the Double Jeopardy Clause after Oregon v. Kennedy*, 69 CORNELL L. REV. 76, 92 n.92 (1983) (suggesting that the defendant should not lack a remedy at the appellate level solely because the government was initially successful in concealing its misconduct).

after-discovered evidence indicating that the Commonwealth had committed intentional misconduct at trial by withholding exculpatory proofs and falsely denying the existence of an agreement with one of its main witnesses, Smith asserted that retrying him would violate his double jeopardy rights. This Court agreed.

Justice Flaherty, this time writing for the full Court, expressed that the Commonwealth's actions "violate[d] all principles of justice and fairness embodied in the Pennsylvania Constitution's double jeopardy clause." *Smith*, 532 Pa. at 183, 615 A.2d at 324. Echoing the point he made from a concurring posture in *Simons*, he then observed that the misconduct could not logically satisfy *Kennedy*'s "goading" standard as its intent was that "the defendant should never know how his wrongful conviction came about." *Id.* at 180-81, 615 A.2d at 322 (quoting *Simons*, 514 Pa. at 23, 522 A.2d at 544 (Flaherty, J., concurring)). Then, returning to the "overreaching" litmus that the United States Supreme Court had used prior to *Kennedy*, *see id.* at 184, 615 A.2d at 324 (quoting *Starks*, 490 Pa. at 341, 416 A.2d at 500), Justice Flaherty granted relief, summarizing the state-constitutional standard as follows:

> We now hold that the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial.

*Id.* at 186, 615 A.2d at 325; *accord Commonwealth v. Hawkins*, 549 Pa. 352, 371, 701 A.2d 492, 501 (1997) ("In order to raise double jeopardy implications, the prosecutor's misconduct must have been deliberate, undertaken in bad faith and with a specific intent to deny the defendant of a fair trial." (citing *Commonwealth v. Chambers*, 546 Pa. 370, 379-81, 685 A.2d 96, 101 (1996))).

Although the holding in *Smith* was articulated in a case involving the government's intentional suppression of material information, it was later interpreted

broadly in *Martorano* to encompass all serious prosecutorial misconduct undertaken with the purpose of denying the defendant his constitutional right to a fair trial. *See Martorano*, 559 Pa. at 538-39, 741 A.2d at 1223.[9]

In spite of the broader protections reflected in *Smith* and *Martorano*, later case law clarified that not all intentional misconduct is sufficiently egregious to be classified as overreaching and, as such, to invoke the jeopardy bar. *See Commonwealth v. Burke*, 566 Pa. 402, 417, 781 A.2d 1136, 1145 (2001) (recognizing that a finding of willful prosecutorial misconduct will not always warrant dismissal of the charges). Rather, the misconduct must be so egregious to constitute overreaching. This limitation on relief arises due to the strong societal interest in bringing the guilty to justice:

> Dismissal of criminal charges punishes not only the prosecutor . . . but also the public at large, since the public has a reasonable expectation that those who have been charged with crimes will be fairly prosecuted to the full extent of the law. Thus, the sanction of dismissal of criminal charges should be utilized only in the most blatant cases. Given the public policy goal of protecting the public from criminal conduct, a trial court should consider dismissal of charges where the actions of the Commonwealth are egregious and where demonstrable prejudice will be suffered by the defendant if the charges are not dismissed.

*Id.* at 416, 781 A.2d at 1144 (quoting *Commonwealth v. Shaffer*, 551 Pa. 622, 627, 712 A.2d 749, 752 (1998)); *see also Commonwealth v. Lee*, 490 Pa. 346, 350, 416 A.2d 503, 505 (1980) (referring to dismissal as an "extreme sanction"); *Commonwealth v. Potter*, 478 Pa. 251, 266-67, 386 A.2d 918, 925 (1978) (observing that, absent extreme

---

[9] In *Martorano*, this Court precluded retrial on jeopardy grounds where, at the first trial, the prosecutor had "acted in bad faith throughout the trial, consistently making reference to evidence that the trial court had ruled inadmissible, continually defying the trial court's rulings on objections, and, . . . repeatedly insisting that there was fingerprint evidence linking Appellees to the crime when the prosecutor knew for a fact that no such evidence existed." *Id.* at 538, 741 A.2d at 1223.

circumstances, the remedy of a new trial adequately vindicates both the defendant's interest in a fair trial and society's interest in bringing criminals to justice).

Against this backdrop, Appellant presently portrays the Commonwealth's misconduct as tantamount to bad faith in that the entire prosecution team was extremely careless in its handling of a capital case, with the result that Appellant was confined to death row, with its attendant risk of execution, for nine years before the mistakes were discovered. He emphasizes that the Superior Court characterized such conduct as involving "deliberate indifference" to an unjustifiable risk of harm (*i.e.*, a false conviction and potential execution), Brief for Appellant at 30 (quoting *Johnson*, No. 927 EDA 2016, 2018 WL 3133226, at *6), which he likens to malice as that concept is used in the third-degree murder context. As such, Appellant argues that, as in *Martorano*, "bad faith . . . is at the heart of" the present double jeopardy analysis. *Id.* at 32.

Beyond this, and with reference to the American Bar Association's standards relating to the prosecutorial function, which indicates that such function includes the duty to seek justice and not merely to convict, Appellant characterizes the reasoning of cases such as *Smith* and *Martorano* as standing for the broad position that prosecutors should "be held to a minimum standard of accountability and decency." *Id.* at 34. He argues the Commonwealth's behavior in this case fell below that benchmark.

Finally, Appellant notes that some other jurisdictions have formulated double-jeopardy tests which take into account whether the prosecutorial misconduct entailed intentionality *or* indifference to the possibility of a mistrial or reversal on appeal, *see id.* at 37-38 (citing cases), and he urges this Court to apply these same principles in present case. Such application, Appellant maintains, would result in his immunity from retrial. *See id.* at 38-39.

The Commonwealth argues that the *Smith-Martorano* test, being based on whether the prosecution intended to provoke a mistrial motion or deny the defendant a fair trial, is workable, and that it strikes a "reasoned balance" between a defendant's interest in being free from successive prosecutions and society's interest in determining guilt or innocence. Brief for Commonwealth at 20. The government urges that criminal trials are often complex undertakings where many things can "go wrong" and justify either a mistrial or a new trial on appeal. *Id.* at 21. It suggests that moving to a non-intent-based standard – including one predicated on moral or ethical considerations, or on rules of professional responsibility – will have unintended consequences, such as engendering confusion every time a new trial is granted based on a *Brady* violation.[10]

In contrast to *Smith-Martorano*, the Commonwealth contends, Appellant's proposed standard is impractical for courts to apply due to the many instances in which some sort of unintentional failing by the prosecutor can be identified. More broadly, the Commonwealth maintains that a "deliberate indifference" test is ill-advised, referencing judicial expressions indicating that the term resists clear delineation, and that such a construct would transform double-jeopardy relief into a common remedy, when it has always been viewed as an "extreme sanction" that should be imposed sparingly. *Id.* at 22 (quoting *Burke*, 566 Pa. at 416, 781 A.2d at 1144). In any event, the Commonwealth points out that the common pleas court never used the term "deliberate indifference" in its fact-finding. It notes that this phrase represents the Superior Court's post-hoc characterization and, as such, this Court need not defer to it. *See* Brief for Commonwealth at 23 & n.9.

---

[10] *See Brady v. Maryland*, 373 U.S. 83, 87-88, 83 S. Ct. 1194, 1196-97 (1963) (holding that a prosecution's failure to disclose exculpatory evidence to the defense violates due process); *see also* Pa.R.Crim.P. 573 (relating to disclosure requirements).

The Commonwealth additionally undertakes its own analysis of the reported decisions in which other states have considered whether to expand upon the goading-into-a-mistrial test announced in *Kennedy*. The Commonwealth generally portrays that those standards are substantially narrower than the one for which Appellant presently advocates. *See id.* at 25-29 (discussing cases).

The Pennsylvania District Attorneys Association has submitted an *amicus* brief favoring affirmance. The Association argues that making jeopardy relief available absent intentional misconduct will unduly frustrate the law's purpose of protecting society from criminals. *See* Brief for *Amicus* at 7 (indirectly quoting *Shaffer*, 551 Pa. at 628, 712 A.2d at 752). *Amicus* urges this Court not to lose sight of the distinction between prosecutorial error and prosecutorial overreaching. *See id.* at 8.

This latter point is well taken because, as explained, *Smith*'s departure from *Kennedy* was only to the extent of the federal Double Jeopardy Clause's scope pre-*Kennedy*. *See Martorano*, 559 Pa. at 537, 741 A.2d at 1223 (noting that *Smith* "abandoned the *Simons* standard and returned to the pre-*Kennedy* rule"). Before *Kennedy*, this Court had held, based on the text and history of Pennsylvania's Double Jeopardy Clause, that the state provision offered no greater protection than the Fifth Amendment. *See Hogan*, 482 Pa. at 342-43, 393 A.2d at 1137-38.

The concept embodied in *Smith*, therefore, is that the meaning of a specific provision of the Pennsylvania Constitution, once it has been deemed coterminous with its federal counterpart, should not then be made to shift and change indefinitely based on "ever-shifting High Court majorities[.]" *Commonwealth v. Gibson*, 597 Pa. 402, 476 n.9, 951 A.2d 1110, 1154 n.9 (2008) (Castille, J., concurring); *accord Pap's A.M. v. City of Erie*, 571 Pa. 375, 408-09, 812 A.2d 591, 611 (2002) (making this same point in the context of state and federal provisions shielding freedom of expression).

Moreover, *Smith* itself was grounded on the distinction between mere error and overreaching, *see Smith*, 532 Pa. at 184, 615 A.2d at 324, as set forth in the pre-*Kennedy* case of *Starks*. *Starks* conveyed that, whereas prosecutorial errors are an "inevitable part of the trial process," prosecutorial overreaching is not. *Starks*, 490 Pa. at 341, 416 A.2d at 500. Just as important, overreaching signals that the judicial process has fundamentally broken down because it reflects that the prosecutor, as representative of an impartial sovereign, is seeking conviction at the expense of justice. *See Simons*, 514 Pa. at 13, 522 A.2d at 539 (quoting *Commonwealth v. Cherry*, 474 Pa. 295, 301, 378 A.2d 800, 803 (1977)). As such, according to *Starks*, it is the very type of "tactic which the double jeopardy clause was designed to protect against." *Starks*, 490 Pa. at 341, 416 A.2d at 500.[11]

In sum, then, although this Court departed from the Fifth Amendment in the wake of the Supreme Court's *Kennedy* decision, it has never disavowed the "overreaching" prerequisite, which is firmly entrenched in this Court's case precedent from both the pre- and post-*Kennedy* timeframes.

The question thus becomes whether the type of misconduct which qualifies as overreaching is broad enough, under our state constitution, to encompass governmental errors that occur absent a specific intent by the prosecutor to deny the defendant his constitutional rights. To answer that question, it is helpful to consult the reasoning contained in reported decisions from other jurisdictions. Many have departed from strict adherence to the *Kennedy* rule and adopted a construct focusing on whether the prosecutor commits prejudicial misconduct with *either* knowledge of *or indifference to* a

---

[11] This distinction was, as well, the basis for *Martorano*'s clarification that *Smith*'s holding was not limited to its facts, but encompassed any bad-faith misconduct intended to deprive the defendant of a fair trial. *See Martorano*, 559 Pa. at 538-39, 741 A.2d at 1223.

significant risk of mistrial or reversal on appeal.[12] These types of departures have been articulated using various descriptions, with some courts inquiring whether the prosecutor acted with a "willful disregard" of the resulting mistrial or appellate reversal, *Breit*, 930 P.2d at 803, and others asking whether the government official who committed the misconduct either intended, or was "indifferent to," such a result. *Kennedy*, 666 P.2d at 1326.[13]

---

[12] *See Pool v. Superior Court*, 677 P.2d 261, 271-72 (Ariz. 1984); *People v. Dawson*, 397 N.W.2d 277, 284 (Mich. Ct. App. 1986) (adopting the *Pool* standard under the Michigan Constitution), *aff'd on other grounds*, 427 N.W.2d 886 (Mich. 1988); *Thomas v. Eighth Judicial District Court*, 402 P.3d 619, 626-27 (Nev. 2017) (same under the Nevada Constitution); *State v. Breit*, 930 P.2d 792, 803 (N.M. 1996); *State v. Kennedy*, 666 P.2d 1316, 1326 (Or. 1983); *Bauder v. State*, 921 S.W.2d 696, 699 (Tex. Ct. Crim. App. 1996), *overruled by Ex Parte Lewis*, 219 S.W.3d 335, 337 (Tex. Ct. Crim. App. 2007). *But see State v. White*, 369 S.E.2d 813, 815 (N.C. 1988) (adhering to the *Kennedy* Court's specific-intent litmus).

Perhaps the broadest standard was adopted *in State v. Rogan*, 984 P.2d 1231 (Haw. 1999), in which the court construed the state constitution's double-jeopardy provision as indicating that "egregious prosecutorial misconduct," regardless of *mens rea*, bars retrial unless it is proved beyond a reasonable doubt that the defendant received a fair trial in spite of such misconduct. *Id.* at 1249.

[13] It may also be noted that, before the "overreaching" rubric was discarded in *Kennedy*, some federal appellate courts construed the term to encompass a relatively broad scope of misconduct. In *United States v. Martin*, 561 F.2d 135 (8th Cir. 1977), for example, the Eighth Circuit equated prosecutorial overreaching with either intentional misconduct or gross negligence. Recounting the offending aspect of trial, the court concluded that it embodied, "at a minimum . . . gross negligence" by the prosecutor, and possibly intentional misconduct. *Id.* at 140. In the court's view, this was sufficient to conclude that prosecutorial overreaching had occurred, thereby barring retrial on jeopardy grounds. And in *United States v. Kessler*, 530 F.2d 1246 (5th Cir. 1976), the Fifth Circuit granted double-jeopardy relief on the basis of intentional misconduct while stating in *dicta* that prosecutorial overreaching could be found based on governmental "gross negligence or intentional misconduct" causing "aggravated circumstances to develop" injurious to a defendant's constitutional right to a fair trial. *Id.* at 1256 (internal quotation marks and citations omitted).

Regardless of the particular wording employed, these state courts have essentially reasoned that such conduct contravenes one of the main objectives underlying the jeopardy bar, namely, that a defendant should not have to choose between (a) having his fate decided by his first jury notwithstanding that the proceedings are infected by serious errors, or (b) enduring a new proceeding from the beginning with the expense, anxiety, and disruption it entails, and with the government in a better position to marshal evidence and anticipate the defense strategy. These factors, in turn, stem from double jeopardy's fundamental policy objective that defendants not be put to multiple trials for the same offense – particularly in view of the government's power and resources which would otherwise enable it to subject defendants to serial proceedings. *See Pool*, 677 P.2d at 271-72; *id.* at 271 (quoting *Green v. United States*, 355 U.S. 184, 187-88, 78 S. Ct. 221, 223 (1957)); *Kennedy*, 666 P.2d at 1326; *accord Dinitz*, 424 U.S. at 609, 96 S. Ct. at 1080 (explaining that an important double-jeopardy concern is that the accused not be put to a "'Hobson's choice' between giving up his first jury and continuing a trial tainted by prejudicial judicial or prosecutorial error").

We agree with the observations of our sister States. It is established that the jeopardy prohibition is not primarily intended to penalize prosecutorial error, but to protect citizens from the "embarrassment, expense and ordeal" of a second trial for the same offense and from "compelling [them] to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent [they] may be found guilty." *Commonwealth v. Ball*, 637 Pa. 100, 114, 146 A.3d 755, 763 (2016) (quoting *Green*, 355 U.S. at 187-88, 78 S. Ct. at 223); *accord State v. Moore*, 390 P.3d 1010, 1014 (Or. 2017); *State v. McClaugherty*, 188 P.3d 1234, 1242 (N.M. 2008) (observing that the test under the state constitution "focuses on the *effect* of the

prosecutorial misconduct on the defendant, regardless of the prosecutor's intent" (emphasis in original)). When the government engages in improper actions sufficiently damaging to undercut the fairness of a trial, it matters little to the accused whether such course of conduct was undertaken with an express purpose to have that effect or with a less culpable mental state. Either way, the conduct imposes upon the defendant the very "Hobson's choice" which double jeopardy seeks to prevent. *See Bauder*, 921 S.W.2d at 699 ("In our view, putting a defendant to this choice, even recklessly, is constitutionally indistinguishable from deliberately forcing him to choose a mistrial."); *cf. Strickler v. Greene*, 527 U.S. 263, 288, 119 S. Ct. 1936, 1952 (1999) (recognizing that if the prosecutor's suppression of *Brady* material "results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor" (internal quotation marks and citation omitted)).

Therefore, we ultimately conclude as follows. Under Article I, Section 10 of the Pennsylvania Constitution, prosecutorial overreaching sufficient to invoke double jeopardy protections includes misconduct which not only deprives the defendant of his right to a fair trial, but is undertaken recklessly, that is, with a conscious disregard for a substantial risk that such will be the result. This, of course, is in addition to the behavior described in *Smith*, relating to tactics specifically designed to provoke a mistrial or deny the defendant a fair trial. In reaching our present holding, we do not suggest that all situations involving serious prosecutorial error implicate double jeopardy under the state Charter. To the contrary, we bear in mind the countervailing societal interests mentioned above regarding the need for effective law enforcement, *see generally State v. Michael J.*, 875 A.2d 510, 534 (Conn. 2005) (referring to the need for an "optimal balance between the defendant's double jeopardy rights and society's interest in enforcing its criminal laws"), and highlight again that, in accordance with long-

established double-jeopardy precepts, retrial is only precluded where there is prosecutorial *overreaching* – which, in turn, implies some sort of conscious act or omission. Notably, however, this Court has explained, albeit in a different context, that reckless conduct subsumes conscious behavior. *See Tayar v. Camelback Ski Corp., Inc.*, 616 Pa. 385, 402, 47 A.3d 1190, 1200 (2012) (indicating that recklessness, as distinguished from negligence, "requires conscious action or inaction which creates a substantial risk of harm to others").

Applying our holding to the facts of this case, the common pleas court saliently found that the experienced prosecuting attorney made "almost unimaginable" mistakes, which "dovetailed" with other serious errors by law-enforcement officers and other police personnel such as the DNA lab technician. In terms of the errors made by the attorney himself, first, there was a notable discrepancy between the property receipt numbers for the two caps. The prosecutor was aware this meant that the associated results reflecting the presence of the victim's blood and Appellant's DNA might have related to different pieces of physical evidence. Yet, in the face of this information, he never sought to verify his working hypothesis that the receipt numbers pertained the same baseball cap. He did not even notice this error at the preliminary hearing when he had in his possession property receipt number 2425291, which clearly stated that it was associated with a black baseball cap. Second, in preparation for a capital case, the prosecutor did not obtain a criminalistics report which would have summarized the evidence connected with the matter and revealed that there were two different caps involved.

As to the court's suggestion that these items "dovetailed" with the errors of other law enforcement personnel who held lead roles in the investigation and prosecution, there are two particularly noteworthy examples. First, on the night of the shooting, the

assigned detective interviewed the victim's companion, Ms. Williams, who personally handed him a black baseball cap with a bullet hole in it, and explained that it was the hat the victim was wearing when he was shot. This crucial piece of information was apparently forgotten as the investigation ensued. Second, the lead crime scene investigator testified that, when he went to the location of the murder, he saw fresh drops of blood under the brim of the red cap, when that would have been impossible – as persuasively explained by the common pleas court. Additionally, the fact that no photographs of the underside of the brim were part of the crime scene record appears not to have been viewed as problematic by anyone associated with the prosecution. We, like the common pleas court, cannot escape the conclusion that the officer testified to something that he did not actually observe, especially in light of his subsequent explanation that the testimony was wrong and was based on a mere assumption. *Cf. supra* note 6.[14]

Although the record, as discussed, supports the common pleas court's ultimate finding that these acts and omissions were not made intentionally or with a specific purpose to deprive Appellant of his rights, the record is likewise consistent with that tribunal's characterization that such mistakes were "unimaginable." Although "unimaginable" is not a traditional *mens rea* descriptor, it is, together with all of the

---

[14] For double jeopardy purposes, unfairly prejudicial statements by witnesses generally are not chargeable to the prosecuting attorney, especially when they are unexpected and made on cross-examination. *Accord State v. Wittsell*, 66 P.3d 831, 836 (Kan. 2003); *State v. Lee*, 344 S.W.3d 865, 871 (Mo. Ct. App. 2011).

With that said, in the present dispute the officers' material erroneous testimony was expected by the district attorney and was elicited on direct examination. As well, such errors were substantively intertwined with the Commonwealth's central theory of the case based on the supposed presence at the crime scene of only a single baseball cap. Therefore, they carry some weight in our analysis, but only insofar as they tend to magnify the errors made by the prosecutor himself.

circumstances on which it was based, strongly suggestive of a reckless disregard for consequences and for the very real possibility of harm stemming from the lack of thoroughness in preparing for a first-degree murder trial. *See generally Johnson*, 2018 WL 3133226, at *1 (expressing that the Commonwealth acted with "deliberate indifference" during its preparation for trial).[15] There is little dispute that those consequences include "prejudice [to] the defendant to the point of the denial of a fair trial." *Smith*, 532 Pa. at 186, 615 A.2d at 325. That being the case, Article I, Section 10 immunizes Appellant from being put in jeopardy a second time for the crimes with which he was charged in connection with the killing of Walter Smith.

Accordingly, the judgment of the Superior Court is reversed and the matter is remanded for entry of an order granting Appellant's motion to preclude retrial.

Justices Todd, Donohue, Dougherty and Wecht join the opinion.

Justice Dougherty files a concurring opinion.

Justice Mundy files a dissenting opinion in which Justice Baer joins.

---

[15] As summarized above, Appellant stresses that the injury comprises the risk of an erroneous conviction, years spent on death row, and potential execution predicated on a fundamentally flawed trial. The harm in this case also includes substantial resources expended in years of post-conviction proceedings and in litigating the current pre-trial motion to dismiss.